1              United States District Court

2          for the Southern District of California

3
                                    )
4    UNITED STATES OF AMERICA,       )
                                    )   No. 18cr4781-BAS
5         Plaintiff,                 )
                                    )   May 8, 2019
6              v.                    )
                                    )   San Diego, California
7    JOSÉ LUIS NUNEZ-SOBERANIS,      )
                                    )
8         Defendant.                 )
                                    )
9

10               TRANSCRIPT OF EVIDENTIARY HEARING
              BEFORE THE HONORABLE CYNTHIA BASHANT
11               United States District Judge

12   APPEARANCES:

13   For the Plaintiff:     UNITED STATES ATTORNEY'S OFFICE
                            SHAUNA R. PREWITT
14                          Assistant United States Attorney

15   For the Defendant:     FEDERAL DEFENDERS OF SAN DIEGO, INC.
                            ERIC STUDEBAKER FISH
16                          RYAN W. STITT
                            Attorneys at Law

17

18

19

20   Court Reporter:        Dana Peabody, RDR, CRR
                            District Court Clerk's Office
21                          333 West Broadway, Suite 420
                            San Diego, California 92101
22                          DanaPeabodyCSR@gmail.com

23

24

25

2

```
 1   Case:  USA v. JOSÉ LUIS NUNEZ-SOBERANIS
     Date:  May 8, 2019
 2

 3
                     INDEX OF WITNESSES
 4
     FOR THE PLAINTIFF:
 5                                  E X A M I N A T I O N
                                 DIRECT  CROSS REDIRECT RECROSS
 6
     Sean Yim
 7   Ms. Prewitt                     6
     Mr. Stitt                             19
 8

 9

10
     FOR THE DEFENDANT:
11                                  E X A M I N A T I O N
                                 DIRECT  CROSS REDIRECT RECROSS
12
     José Nunez-Soberanis
13   Mr. Fish                        31
     Ms. Prewitt                           33
14

15

16

17

18

19

20

21

22

23

24

25
```

1        San Diego, California, May 8, 2019

2                   *   *   *

3        THE CLERK:  Calling matter number 1, 18cr4781, United

4   States of America versus José Luis Soberanis Nunez-Soberanis,

02:13   5   on calendar for evidentiary hearing.

6        MS. PREWITT:  Shauna Prewitt on behalf of the

7   United States.

8        THE COURT:  Good afternoon.

9        MR. FISH:  Eric Fish on behalf of Mr. Nunez-Soberanis,

02:13   10   who is present on bond, with Ryan Stitt, also of my office.

11        MR. STITT:  Good afternoon.

12        THE COURT:  Good afternoon.

13     This is set for an evidentiary hearing.  The only issue for

14   the evidentiary hearing is whether -- the broad issue is

02:13   15   whether there was a due process violation.  The limited issue

16   is whether the expedited removal hearing was conducted in

17   English or in Spanish, and whether there was any discussion,

18   or, if it was conducted in English, why it was conducted in

19   English, whether there was any attempt to make sure whether

02:14   20   Mr. Nunez understood English and understood what was going on.

21   So that's really the limited issue that we are addressing at

22   this point in time.

23     Once I cross that bridge, then we can decide whether we

24   need additional briefing on prejudice or additional discovery

02:14   25   on the issue of prejudice.

1          Any questions about the scope of the hearing?

2              MS. PREWITT:  Your Honor, I just wanted to inquire.  I

3    know a portion of the briefing dealt with defendant's claim

4    that he also wasn't given limited time in order to review the

02:14    5    documents that were put forward in front of him, and I just

6    wondered if the evidence hearing was appropriate to touch on

7    that as well.

8              THE COURT:  Sure, we can cover that as well.

9              MR. FISH:  And I think we may also need to cover

02:14    10   whether the agent followed the procedures as set forth in the

11   regulations.

12             THE COURT:  What do you mean?  Like what procedures

13   are you claiming were violated?

14             MR. FISH:  Procedures for -- well, they stated in the

02:15    15   declaration that he didn't consult with any governing guidance,

16   and so, for example, the memorandum that I attached to my

17   motions showing the protocols for having to find an interpreter

18   during an expedited removal proceeding.

19             THE COURT:  The allegations at this point are whether

02:15    20   there was an interpreter, whether there was not an interpreter,

21   whether the person spoke Spanish or not.  Then we can

22   discuss -- I don't think as far as -- there's no allegations

23   about violation of procedures, and that's kind of generic

24   anyway.  I really want to focus on the real issue in my -- at

02:15    25   least as far as in the allegations so far, which is what

1    language was used and why.

2              MR. FISH:  Okay.

3              MS. PREWITT:  And, Your Honor, just so --

4              THE COURT:  Whether Mr. Nunez understood what was

02:16   5    going on is really what the issue is.

6              MS. PREWITT:  And, Your Honor, just so I can make the

7    record that the United States does not dispute that it is

8    appropriate for an individual to have an expedited removal

9    conducted in the language that they understand.

02:16  10              THE COURT:  I don't think there's any question legally

11   on that issue, so I'm glad the government is conceding that.

12       You may call your first witness, Ms. Prewitt.

13              MS. PREWITT:  Thank you, Your Honor.

14       At this time the United States calls Officer Sean Yim to

02:16  15   the stand.

16                         SEAN YIM,

17                 PLAINTIFF'S WITNESS, SWORN

18              THE CLERK:  Would you state and spell your full name

19   for the record.

02:17  20              THE WITNESS:  Sean Yim, S-E-A-N is my first name; last

21   name, Y-I-M.

22              THE CLERK:  Thank you.

23              THE COURT:  Thank you.

24

25

1    Ms. Prewitt.

2                         DIRECT EXAMINATION

3    BY MS. PREWITT:

4    Q.   Officer Yim, what is your job title?

02:17    5    A.   I'm a Customs and Border Protection officer at San Ysidro

6    Port of Entry.

7    Q.   And, sir, how long have you been with Customs and Border

8    Protection?

9    A.   I've been with Customs and Border Protection since May 10,

02:17    10    2010.

11    Q.   And where are you currently assigned?

12    A.   I'm assigned to AU, Admissibility Enforcement Unit in San

13    Ysidro.

14    Q.   And when were you assigned to AEU, also known as the

02:17    15    Admissibility Enforcement Unit?

16    A.   October 1, 2016.

17    Q.   What is the Admissibility Enforcement Unit?

18    A.   It is special unit where we process various adverse action

19    such as removals, asylum cases, Notice to Appear, visa

02:18    20    cancellation, in that nature.

21    Q.   And, sir, did you receive training on how to do your job

22    with AEU?

23    A.   Yes, ma'am.

24    Q.   And did that include training on immigration law in Glynco,

02:18    25    Georgia?

| | |
|---|---|
| 1 | A.   Yes, ma'am. |
| 2 | Q.   Did that also include on-the-job training? |
| 3 | A.   Yes, ma'am. |
| 4 | Q.   As an officer with AEU, did you conduct expedited removals? |
| 02:18  5 | A.   Yes. |
| 6 | Q.   And how many expedited removals would you say that you've |
| 7 | conducted in your career? |
| 8 | A.   I would say more than a hundred cases. |
| 9 | Q.   Officer Yim, directing your attention to October 8th of |
| 02:18  10 | 2018. |
| 11 |         MR. FISH:   Could I hear the answer to that last |
| 12 | question again? |
| 13 |         THE COURT:   The answer was, "I would say more than a |
| 14 | hundred cases." |
| 02:19  15 |         THE INTERPRETER:   The interpreter did not hear that. |
| 16 |         THE COURT:   More than a hundred cases. |
| 17 | BY MS. PREWITT: |
| 18 | Q.   Officer Yim, I'd like to direct your attention to |
| 19 | October 8th, 2018.   On that date, did you meet the defendant? |
| 02:19  20 | A.   Yes, ma'am. |
| 21 | Q.   How did you come to meet him? |
| 22 | A.   I was -- the case was assigned to me to process his case. |
| 23 | Q.   To process it how? |
| 24 | A.   Expedited removal. |
| 02:19  25 | Q.   Okay.   Officer Yim, sitting here today, do you specifically |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | recall all of the details of your meeting with the defendant? |
|       | 2  | A.  Yes, ma'am.                                               |
|       | 3  | Q.  And are you testifying, then, today based on your personal |
|       | 4  | knowledge?                                                    |
| 02:19 | 5  | A.  Yes.                                                      |
|       | 6  | Q.  And are you also testifying based on standard procedures  |
|       | 7  | that you use in expedited removals?                           |
|       | 8  | A.  Yes.                                                      |
|       | 9  | Q.  Okay.  I'd like to turn and discuss how you conduct       |
| 02:20 | 10 | expedited removals.  On days you're assigned to conduct       |
|       | 11 | expedited removals, what's the first thing you do?            |
|       | 12 | A.  The first thing I do, I review A File.                    |
|       | 13 | Q.  You review the individual's A File?                       |
|       | 14 | A.  Yes.                                                      |
| 02:20 | 15 | Q.  Okay.  And what do you do with that information?          |
|       | 16 | A.  With that information, make sure I have -- all the        |
|       | 17 | information on the A File is correct, and after that, I upload |
|       | 18 | document, you know, to process the case.                      |
|       | 19 | Q.  Okay.  So once you've reviewed and verified the A File    |
| 02:20 | 20 | information and uploaded the documents, what do you do next?  |
|       | 21 | A.  After that, I go to the detainee cell, bring the subject  |
|       | 22 | out, and start to interview.                                  |
|       | 23 | Q.  And where do you take the individual for this interview?  |
|       | 24 | A.  I take them to this office with the cubicles with maybe,  |
| 02:20 | 25 | like, eight, ten different desks.  It's a private area.       |

1    Q.   Okay.  And before you conduct this interview, do you speak

2    to the subjects that you are going to be interviewing?

3    A.   Because from detainee cell to the process area where

4    process, I would say, probably, it's about two, three minutes'

02:21   5    walk, so I casually talk to him what's going to happen.

6    Q.   Before you begin the interview, do you also speak with him?

7    A.   Yes.

8    Q.   And is part of that asking the individual what language he

9    or she would like to speak in?

02:21   10   A.   Yes, ma'am.

11             MR. FISH:  Objection.  Leading.

12             THE COURT:  Sustained.

13   BY MS. PREWITT:

14   Q.   Are you a fluent English speaker?

02:21   15   A.   Yes, ma'am.

16   Q.   Do you speak any other languages?

17   A.   I also speak Spanish.

18   Q.   Have you received training in how to speak Spanish?

19   A.   Yes, we did.

02:21   20   Q.   Have you ever conducted expedited removals in Spanish

21   before?

22   A.   Yes.

23   Q.   Officer Yim, do you prefer to conduct an expedited removal

24   in one language or another?

02:21   25   A.   No, there's no preference.

1  Q.  Do you recall on October 8, 2018, what language was used
2  during the defendant's expedited removal?
3  A.  English.
4  Q.  Did you ask the defendant what language he wanted to use
02:22  5  during the interview?
6  A.  Yes, ma'am.
7  Q.  And do you recall when you asked him that?
8  A.  I asked the subject twice as I was walking him to the
9  processing area.  I asked him if he speaks English, and prior
02:22  10  to start the interview, I also asked him what language he's
11  comfortable doing the interview in for the interview.
12  Q.  And what did he say?
13  A.  Both times he said English.
14  Q.  Okay.  And then during the course of your interview, did
02:22  15  the defendant seem to understand you?
16  A.  Yes.
17  Q.  Agent Yim, if an individual you're speaking to elects to
18  speak in English, but then doesn't seem to understand, what do
19  you do in those circumstances?
02:22  20          MR. STITT:  Objection.  Speculation.
21          THE COURT:  Sustained.
22  BY MS. PREWITT:
23  Q.  Officer Yim, have you ever had an experience where an
24  individual has elected to proceed in English, but then doesn't
02:23  25  seem to understand?

          1   A.   Yes.

          2            MR. STITT:  Objection.  Relevance.

          3            THE COURT:  I'll allow it.

          4   BY MS. PREWITT:

02:23     5   Q.   And what do you do in those circumstances?

          6   A.   At any point during my interview, if subject doesn't

          7   understand English, I ask him what language he prefer to speak.

          8   If officer is available for the translation, I use that option.

          9   If he asks me speak Spanish, I make a transition to Spanish,

02:23    10   and we also have a service, an interpreter service, that we can

         11   call over the phone.

         12   Q.   Okay.  Officer Yim, I have a series of exhibits.

         13            MS. PREWITT:  Your Honor, may I approach?

         14            THE COURT:  Sure.

02:24    15   BY MS. PREWITT:

         16   Q.   Officer Yim, if you could look at, first, what's been

         17   marked as United States Exhibit Number 1.  Do you recognize

         18   this document?

         19   A.   Yes, ma'am.

02:24    20   Q.   And what is it?

         21   A.   It is a Q and A.  That's the interview.  When I conduct the

         22   interview, that's the questions and answers that I asked and

         23   write down for the answers.

         24   Q.   Okay.  And before you begin an interview, do you advise

02:24    25   individuals of their rights?

```
 1    A.   Yes.

 2    Q.   Does that rights advisal appear on this form?

 3    A.   Yes.

 4    Q.   And do you read this advisal in its entirety?

 5    A.   Yes.

 6    Q.   Did you do that in this case?

 7    A.   Yes.

 8    Q.   After that is concluded, what did you ask the defendant?

 9              MR. FISH:  Objection.

10              THE WITNESS:  I asked the subject if --

11              THE COURT:  I'm sorry.  Wait when there's an

12    objection.  I'm sorry.  What was the objection?

13              MR. FISH:  Leading.

14              THE COURT:  Sustained.

15         You may wait for the next question.

16    BY MS. PREWITT:

17    Q.   What did you do after you finished the rights advisal?

18    A.   I asked the subject making sure he understood what I just

19    told him.

20    Q.   And what did he say?

21    A.   He said yes.

22    Q.   Okay.  Did you ever ask during the course of the interview

23    whether the defendant had any questions?

24    A.   Yes.

25    Q.   And what did he say?
```

1    A.   He said no.

2    Q.   Throughout the interview, what language did the defendant

3    use to answer your questions?

4    A.   English.

02:25    5    Q.   And did he seem to understand your questions?

6            MR. FISH:  Objection.  Leading.

7            THE COURT:  Overruled.  You may answer.  Did he seem

8    to understand you?

9            THE WITNESS:  Yes, ma'am.

02:25   10   BY MS. PREWITT:

11   Q.   In your view, did it seem like he was answering the

12   questions coherently?

13   A.   Yes.

14   Q.   At any point did he ask you to speak in Spanish?

02:25   15   A.   No.

16   Q.   At any point did he indicate that he did not understand

17   you?

18   A.   No.

19   Q.   At any point did he ask you to speak slower?

02:26   20   A.   No.

21   Q.   After you finished this interview, did you determine

22   whether the defendant would be removed?

23   A.   Yes.

24   Q.   And what did you determine?

02:26   25   A.   Due to his prior immigration violation, he was being

1   removed for 20 years.

2   Q.   And, Officer Yim, once you completed the interview, what

3   did you do at that point?

4   A.   Based on the interview, I worked on my report.

02:26   5   Q.   I'm sorry?

6   A.   I -- after the interview, I print out the forms, I serve

7   all the serving documents to the subject making sure he

8   understood all the forms.  I explained to him, and either he

9   signs it or initial each page.

02:26   10   Q.   Okay.  I'd like to break that apart a little bit.  You have

11   in front of you United States Exhibits 2 and 3.  Do you

12   recognize those documents?

13   A.   Yes, ma'am.

14   Q.   And what are those documents?

02:27   15   A.   One of them is the showing -- it's just a determination of

16   admissibility with the charges indicated and --

17   Q.   And which exhibit is that?

18   A.   That is Exhibit 2.

19   Q.   Okay.

02:27   20   A.   Showing basically the charge was he doesn't have entry

21   document, you know, to enter the U.S., and Exhibit 3 is the

22   notice to alien order to be removed.  This paper showing that

23   he's been removed for 20 years.  He cannot come back for 20

24   years.

02:27   25   Q.   Are these two of the documents that you printed out?

```
 1   A.   Yes.
 2   Q.   Okay.  I'd like to begin first with Government's
 3   Exhibit Number 2.  I know you described it for us, but I want
 4   to ask you about the process you used when you -- after you
 5   print out this form.  Okay?  Do you review this form with the
 6   defendant?
 7   A.   Yes, I do.
 8   Q.   Is it a part of your practice to allow individuals to
 9   review this form if they would like to?
10   A.   Yes, ma'am.
11   Q.   Okay.  Did you give a copy of this form to the defendant?
12   A.   Yes, ma'am, we give this to our subject for copy.
13   Q.   Did you ask the defendant whether he had any questions
14   about this form?
15   A.   I asked if he had any questions.  He said no.
16   Q.   Okay.  I'd like to move now to Government's Exhibit Number
17   3.  I know you described this form for us a little bit earlier,
18   but I want to ask you again about the process with this form.
19        With this form, too, did you explain this form to the
20   defendant?
21            MR. STITT:  Objection.  The objection is leading at
22   this point.
23            THE COURT:  Overruled.
24   BY MS. PREWITT:
25   Q.   Did you explain this form to the defendant?
```

1    A.   Yes, ma'am.

2    Q.   And did you ask the defendant whether he had any questions

3    about this form?

4    A.   Yes, ma'am.

02:29   5    Q.   And did he?

6    A.   He said no.

7    Q.   Is it part of your practice to allow individuals to

8    remove -- to review this form as well?

9    A.   Yes, ma'am, yes.

02:29   10   Q.   Now, Officer Yim, I notice that there's a signature at the

11   bottom of Exhibit Number 3.  Whose signature appears on the

12   bottom left-hand corner?

13   A.   That is the defendant's signature.

14   Q.   Okay.  And did you ask the defendant to sign this form?

02:29   15   A.   I had him sign the paper after going over the information

16   on top.

17   Q.   Okay.  And did the defendant ever tell you that he was

18   uncomfortable signing this document?

19   A.   No.

02:29   20   Q.   Did he indicate that he needed more information before he

21   could sign?

22   A.   No.

23   Q.   Looking back at Exhibit Number 1, did you also print out

24   that document?

02:29   25   A.   I'm sorry, what was the question again?

```
        1    Q.   Looking at Government's Exhibit Number 1 --
        2    A.   Yes.
        3    Q.   -- did you print out that document as well?
        4    A.   Yes, ma'am.
02:30   5    Q.   Did you review it with the defendant?
        6    A.   Yes, ma'am.
        7    Q.   And if you could flip to the last page of that document,
        8    towards the middle of the page, it appears that there's a
        9    signature there.
02:30   10   A.   Yes.
        11   Q.   And whose signature is that?
        12   A.   That is our subject's signature.
        13   Q.   Okay.  It also appears that on the preceding three pages
        14   that there are initials?
02:30   15   A.   Yes, ma'am.
        16   Q.   The initials JLNS.  Whose initials are those?
        17   A.   That is also the subject's initials.
        18   Q.   Okay.  So I'd like to discuss with you the process you used
        19   with respect to this document.  Do you review this document
02:30   20   with the individual that you've interviewed?
        21   A.   Yes.
        22   Q.   And did you do that in this case?
        23   A.   Yes.
        24   Q.   And after you review that, do you ask them to then sign and
02:30   25   initial the document?
```

1   A.   Yes.

2   Q.   And why do you ask them to do that?

3   A.   We want to make sure if there's no --

4        THE COURT:   I'm sorry, I missed that.

02:31   5        THE WITNESS:   Make sure it's all correct, making sure

6   everything's correct.

7        THE COURT:   Okay.

8   BY MS. PREWITT:

9   Q.   Okay.  Did the defendant have any corrections?

02:31   10   A.   No.

11   Q.   Did the defendant ever state that he was not comfortable

12   signing or initialling the form?

13   A.   No.

14   Q.   Okay.  Did he ever tell you that he needed more time to

02:31   15   review the document?

16   A.   No.

17   Q.   Officer Yim, what did you do after you finished reviewing

18   United States Exhibits 1, 2, and 3 with the defendant?

19   A.   Based on all this information that I received from the

02:31   20   subject, I start creating my report.

21   Q.   Okay.  And if you could turn to United States Exhibit

22   Number 4, do you recognize that document?

23   A.   Yes, ma'am.

24   Q.   And what is that?

02:31   25   A.   That is my report.

1   Q.   Officer Yim, did you offer the defendant the opportunity to

2   withdraw his application?

3   A.   No, I did not.

4   Q.   And why did you not do that?

02:32   5   A.   He doesn't qualify because he was making illegal entry.

6   Q.   Okay.  Officer Yim, after you completed your report in this

7   case, have you had any other experience or further involvement

8   with this case?

9   A.   No.

02:32   10          MS. PREWITT:   Thank you, Officer Yim.

11      No further questions.

12          THE COURT:   Cross-exam.

13                     CROSS-EXAMINATION

14   BY MR. STITT:

02:32   15   Q.   Good afternoon.  Officer Yim, it's fair to say that you see

16   a high volume of cases at the port of entry?

17   A.   Yes, sir.

18   Q.   When you show up for work each day, there's typically

19   already a case waiting for you to work on?

02:33   20   A.   Yes, sir.

21   Q.   And you're continuously busy throughout the day?

22   A.   Yes, sir.

23   Q.   During your time at the port of entry, I imagine you've

24   seen an increase in cases that you've had to process.  Is that

02:33   25   true?

1    A.   Yes.

2    Q.   In particular, the last year?

3    A.   Yes.

4    Q.   2018 has been, in many ways, a record year for illegal

02:33    5    immigration in the United States?

6    A.   Yes.

7    Q.   And that means that your workload goes up?

8    A.   Yes, sir.

9    Q.   It means you have more cases to work on and less time to do

02:33   10   it?

11   A.   Yes, sir.

12   Q.   You have a working knowledge of Spanish, right?

13   A.   Yes.

14   Q.   And a working knowledge is not fluency?

02:33   15   A.   No.

16   Q.   You're not a court-trained Spanish-language interpreter?

17   A.   I'm sorry, what was that?

18   Q.   You're not a court-certified Spanish-language interpreter?

19   A.   No.

02:33   20   Q.   You're not fluent in -- or proficient in a way that would

21   allow you to translate, like, this legal proceeding that we're

22   having in court today, right?

23   A.   No.

24   Q.   And in fact, you would say that your ability to speak

02:34   25   Spanish is far less proficient than your ability to speak

1    English, right?

2    A.   Right.

3    Q.   You're obviously a fluent English speaker?

4    A.   Yes, sir.

02:34   5    Q.   Did you receive all of your Spanish training at the Glynco

6    academy which you went for training to become a Customs and

7    Border Protection officer?

8    A.   I did my training at Charleston, South Carolina.

9    Q.   But as part of your work with the government?

02:34   10   A.   Yes, sir.

11   Q.   And how long was the training?

12   A.   The training was a little over two months.

13   Q.   And that's the entirety of the Spanish-language training

14   that you've had?

02:34   15   A.   Yes, sir.

16   Q.   You described briefly the, sort of, office area where the

17   expedited removal interviews are conducted, but I'd like to ask

18   you some specific questions, sort of, about that.

19        This is at the port of entry here in San Diego at

02:35   20   San Ysidro?

21   A.   San Ysidro.

22   Q.   And this is a secure office area, correct?

23   A.   Correct.

24   Q.   So you meet the people you're going to interview in a

02:35   25   cellblock, right?

1   A.   Yes.

2   Q.   You take them out of a locked cell, right?

3   A.   Yes.

4   Q.   And then you take them to an office area that's a couple

5   minutes' walk away?

6   A.   Yes.

7   Q.   They're not free to leave?

8   A.   No.

9   Q.   There aren't people from the public present for the

10  hearing?

11  A.   Yes.

12  Q.   This is a private meeting that occurs between you and the

13  person you're interviewing, right?

14  A.   Yes.

15  Q.   It's obviously not a courtroom setting?

16  A.   No.

17  Q.   And this is just -- would you describe it as a general

18  office environment with desks and cubicles and the like?

19  A.   Yes.

20  Q.   The interviews are not recorded, correct?

21  A.   No.

22  Q.   You asked -- now transitioning to Mr. Nunez, you asked

23  Mr. Nunez if he prefers English or Spanish, correct?

24  A.   I asked him if he speaks English.  He said -- answer was

25  yes.  Then prior to the interview, I asked him which language

1    are you comfortable conducting this interview in.  He said

2    English.

3    Q.   Okay.  I'm going to show you a copy of your declaration,

4    which I'm marking Defense Exhibit A.  And then --

02:37    5              MR. STITT:  Your Honor, do you have a copy as well?

6              THE COURT:  I don't.

7              MR. STITT:  Okay.  I'll hand one up.

8              THE COURT:  I can print one up.

9              MR. STITT:  No need.  Your Honor, this was already

02:37   10   filed by the government.

11             THE COURT:  That's why I said I could look it up.

12             MR. STITT:  I know I've marked it as Defense Exhibit

13   A.

14             THE COURT:  I don't think it needs to be marked.  It's

02:37   15   part of the record already.

16             MR. STITT:  Thank you.

17   BY MR. STITT:

18   Q.   Officer Yim, I'd like to -- do you recognize the document I

19   handed you?

02:37   20   A.   Yes, sir.

21   Q.   What is it?

22   A.   This is the declaration that I provided to the DA.

23   Q.   Okay.  And you reviewed it before you signed it?

24   A.   Yes.

02:37   25   Q.   And it's true and accurate?

1    A.    Yes.

2    Q.    I'd like to turn your attention to paragraph 6, which is at

3    the bottom of page 2.   In this paragraph you describe what your

4    typical procedure is for asking someone what language they use?

02:38   5    A.    Yes.

6    Q.    You wrote, "I would ask the individual whether he or she

7    preferred English or Spanish," correct?

8    A.    Correct.

9    Q.    And that's what you did in this case?

02:38   10    A.    Yes.

11    Q.    You did not ask Mr. Nunez -- you did not ask Mr. Nunez if

12    he spoke English well enough to go forward in a legal

13    proceeding, correct?

14    A.    I asked him -- I gave him a choice which language he

02:38   15    prefers to speak for the interview.

16    Q.    I completely understand --

17    A.    Yes.

18    Q.    -- but my question, more specifically, is that you did not

19    ask Mr. Nunez if he spoke English well enough to proceed with a

02:38   20    legal deportation proceeding?

21    A.    Not in that word.

22    Q.    After determining what language the person you're going to

23    interview prefers and beginning the interview, obviously, you

24    provide them a copy of the Record of Sworn Statement.   Is that

02:39   25    right?

```
 1   A.   Yes.

 2   Q.   And that's the Government's Exhibit 1?

 3   A.   Yes.

 4   Q.   Do you have that up there with you?

 5   A.   I do.

 6   Q.   Okay.  The top of the form of Record of Sworn Statement

 7   requires you to add where the interview takes place, the person

 8   you're interviewing, what language is used, et cetera, right?

 9   A.   Yes.

10   Q.   It took place at San Ysidro, and the language was English

11   in this case, correct?

12   A.   Correct.

13   Q.   And below that is a preprinted statement of rights,

14   correct?

15   A.   Correct.

16   Q.   And that's the same statement of rights that's given in all

17   of the expedited removal proceedings that you've been a part

18   of, right?

19   A.   Yes, sir.

20   Q.   This is a standard form?

21   A.   Yes.

22   Q.   You do not read this statement of rights to the people

23   you're interviewing, correct?

24   A.   I do.  I do read them.

25   Q.   I'd like to turn you back to your declaration, page 2,
```

02:39 (line 5)
02:40 (line 10)
02:40 (line 15)
02:40 (line 20)
02:40 (line 25)

1    again, paragraph 6.  Starting at the very bottom of page 2, the

2    last sentence, after determining what language the person

3    prefers, you wrote, quote, I would issue them a copy of the

4    introductory paragraphs of the Record of Sworn Statement to the

02:41   5    individual in English or Spanish and ask him if he or she had

6    any questions in reference to what he or she read."

7        You would then proceed to ask questions and take

8    contemporaneous notes.  Is that correct?

9    A.   Yes.

02:41   10   Q.   This declaration says that you give them the Record of

11   Sworn Statement for them to read.  After they read it, you ask

12   them if they have any questions, right?

13   A.   Yes.

14   Q.   And that's what happened here?

02:41   15   A.   Yes.

16   Q.   Once the person has read the rights contained in the Record

17   of Sworn Statement?

18   A.   Okay.  Hold on.  The statement, did you ask me if I served

19   the actual statement or you're asking, like, I read it to him

02:42   20   and I asked him if he understood his rights?  I didn't serve

21   the document to him.

22   Q.   You wrote in your declaration that once you -- once you

23   determine what language an interviewee prefers, you then issue

24   them the Record of Sworn Statement for them to read and ask

02:42   25   them if they have any questions about it?

         1    A.   I read it over to him and asked him if he has any questions
         2    about that.
         3    Q.   So you did not give it to them to read?
         4    A.   No.
02:42    5    Q.   You read it in this case in English?
         6    A.   Yes.
         7    Q.   You understand, though, that your declaration that you
         8    signed says that it's read -- that the interviewee reads it,
         9    not that you read it to them?  That's page 3, line 2 at the
02:43   10    very top.
        11    A.   Page 2, where?
        12    Q.   Page 3, line 2.
        13    A.   Yes.  He says I asked him if he had any questions,
        14    reference to what he or she was read.
02:43   15    Q.   Not was read, it's what he or she read.
        16    A.   Right.
        17    Q.   Moving on, you then asked Mr. Nunez a series of questions
        18    about his entry and his family and past, correct?
        19    A.   Yes.
02:44   20    Q.   You took notes on a computer?
        21    A.   Yes.
        22    Q.   And then generated this form that we see as Exhibit 1?
        23    A.   Yes.
        24    Q.   You did not read verbatim each and every question and
02:44   25    answer to Mr. Nunez before he signed it, correct?

1  A.   I gave him enough time to go over, but I didn't read them

2  one by one.

3  Q.   And how much time specifically did you give him to review

4  this document?

02:44  5  A.   I told him he could take as much time as he wanted to.  If

6  he has any questions about any of the forms he has to sign or

7  initial, I asked him to just let me know, so there was enough

8  time.

9  Q.   But that wasn't my question.  How much time?

02:44  10  A.   He just signed it and give it back to me.  That was his

11  choice.

12  Q.   How much time?

13  A.   Five minutes.

14  Q.   So he had this document for five minutes, and all he did

02:45  15  was sign it and give it right back to you?

16  A.   It seems like he just didn't want to go over it.  He just

17  initialed it and gave it back to me.

18  Q.   Well, this is a four-page document, so if he had it for

19  five minutes, he would have a minute to read each page, right?

02:45  20  A.   It wasn't like I gave him five minutes.  I gave him as much

21  time as he's needed.  He give it back to me in five minutes.

22  Q.   Okay.  So you gave it to him and left --

23  A.   Yes.

24  Q.   -- and then returned?

02:45  25  A.   I was just sitting there.  I served the documentation.  I

        1    told him to go over.  If there's anything that needs to be
        2    fixed or corrected, let me know.
        3    Q.  I see.  So then you handed him the documentation, and by
        4    that, what do you mean exactly?  That's the Record of Sworn
02:45   5    Statement, obviously, right?  Anything else?
        6    A.  It was the Record of Sworn Statement and also the Exhibit B
        7    and Exhibit 2 and 3.
        8    Q.  Okay.  So just so I make sure everyone's on the same page,
        9    it's the Record of Sworn Statement, Exhibit 1; Exhibit 2 is the
02:46   10   Notice and Order of Expedited Removal?
        11   A.  Yes.
        12   Q.  And then what else?  I didn't catch that.  And Exhibit 3?
        13   A.  And Notice of Admissibility.
        14   Q.  Right, and that's, I think, Exhibit 3, right?
02:46   15   A.  Yes.
        16   Q.  Okay.  So you gave him all of these documents, correct?
        17   A.  Yes.
        18   Q.  And you did not read them to him?
        19   A.  I explained to him Exhibit 2 and 3.  I explained to him
02:46   20   what the charge was and how long he's been removed.
        21   Q.  So you explained two of the three documents to him?
        22   A.  Yes.
        23   Q.  And the two documents you explained are Exhibits 2 and 3,
        24   correct?
02:47   25   A.  Correct.

1   Q.   You did not explain Exhibit 1, which is the Record of Sworn

2   Statement, correct?

3   A.   No.

4          MR. STITT:   May I have just a brief moment,

02:47   5   Your Honor?

6          THE COURT:   Sure.

7   BY MR. STITT:

8   Q.   Officer Yim, I'd like to turn back to something you said at

9   the very beginning of your testimony on direct.   In response to

02:48   10   a question from the prosecutor, you responded that you recall

11   all the details of your meeting with Mr. Nunez.   Is that

12   correct?

13   A.   Yes.

14   Q.   Again, in your declaration, I'd like to point you to a

02:48   15   specific portion.   It's paragraph 4.   And the very middle of

16   paragraph 4, beginning on line 16, you wrote, "While I cannot

17   specifically recall all of the details of my October 8, 2018,

18   encounter with the defendant, I have standard procedures in

19   conducting expedited removals at the port of entry."   You

02:48   20   reviewed and signed this declaration before it was filed,

21   correct?

22   A.   Correct.

23          MR. STITT:   I have no further questions.

24          THE COURT:   Anything further, Ms. Prewitt?

02:48   25          MS. PREWITT:   No, Your Honor.

THE COURT:  Thank you, sir.

Any additional evidence from the government?

MS. PREWITT:  No, Your Honor.

THE COURT:  Any affirmative evidence from the defense?

02:49  MR. FISH:  Yes, Your Honor.  The defense would like to call the defendant Mr. Nunez-Soberanis.

JOSÉ NUNEZ-SOBERANIS,

DEFENDANT'S WITNESS, SWORN

THE CLERK:  Would you state and spell your full name

02:50  for the record.

THE INTERPRETER:  The interpreter was just giving the defendant the option of using the headsets or not.

THE CLERK:  If he can state his name for the record.

THE WITNESS:  José Luis Nunez.

02:50  THE COURT:  Mr. Fish.

DIRECT EXAMINATION

BY MR. FISH:

Q.   Mr. Nunez-Soberanis, I want to ask a couple questions about what happened on October 8, 2018.  On that date, were you

02:50  arrested at the San Ysidro Port of Entry?

A.   Yes.

Q.   After you were arrested, what happened?

A.   When I was detained, they sat me, like, on a corner, like on the sidewalk.  They placed the handcuffs on me.  And they

02:50  had me sitting there so that someone could come and interview

1    me.

2    Q.   Did someone come and interview you?

3    A.   Yes.

4    Q.   Was it the officer who testified previously?

02:51  5    A.   Yes.

6    Q.   Did that officer ask you questions in Spanish?

7    A.   No.

8    Q.   Did he ask you questions in English?

9    A.   Yes.

02:51  10   Q.   Before he interviewed you, did he give you the option to

11   proceed in Spanish?

12   A.   No.

13   Q.   Did he ever tell you that he could get a Spanish

14   interpreter?

02:51  15   A.   No.

16   Q.   Did he ever test your ability to speak English?

17   A.   No.

18   Q.   Did he ask you if you understood English well enough to do

19   a legal proceeding in English?

02:51  20   A.   No.

21   Q.   If he had offered you a Spanish interpreter, would you have

22   used one?

23   A.   Yes.

24         MR. FISH:   No further questions.

25

```
 1              THE COURT:  Cross-exam.
 2                        CROSS-EXAMINATION
 3    BY MS. PREWITT:
 4    Q.  Good afternoon, sir.
 5    A.  Good afternoon.
 6    Q.  Sir, you've lived in the United States for more than 18
 7    years?
 8              MR. FISH:  Objection.  Relevance.
 9              THE COURT:  Overruled.
10        You may answer.
11              THE WITNESS:  Yes.
12    BY MS. PREWITT:
13    Q.  And that was between 1998 and 2016?
14    A.  Correct.
15    Q.  You began learning English one year after you came to the
16    United States, in 1999, correct?
17    A.  Correct.
18    Q.  It's been about 20 years?
19    A.  Correct.
20    Q.  Sir, you've worked in the United States?
21    A.  Yes.
22    Q.  And you've worked in restaurants in the United States?
23    A.  Yes.
24    Q.  And those jobs have been customer-facing jobs?
25    A.  Yes.
```

1   Q.   And those jobs have required you to speak to customers in

2   English?

3   A.   Yes.

4   Q.   And to speak to your bosses in English?

02:53   5   A.   Yes.

6   Q.   You've also taken English classes?

7   A.   Yes.

8   Q.   Sir, do you recall your arrest in this case?

9   A.   Yes.

02:53   10   Q.   And do you recall being asked to give a statement after

11   your arrest?

12   A.   Yes.

13   Q.   And you were asked whether or not you wanted to give that

14   statement in English or Spanish?

02:53   15   A.   Yes.

16   Q.   And at first, you said English?

17   A.   Yes.

18   Q.   But then you gave the option to the agent of proceeding in

19   Spanish?

02:53   20        THE INTERPRETER:   Could you repeat that for the

21   interpreter's sake?

22        MS. PREWITT:   Yes.

23   BY MS. PREWITT:

24   Q.   But then later in the interview, you told the agent you

02:53   25   could also speak in Spanish?

| | | |
|--|--|--|
| | 1 | A.   Yes. |
| | 2 | MS. PREWITT:  No further questions. |
| | 3 | THE COURT:  Anything further? |
| | 4 | MR. FISH:  Nothing further. |
| 02:54 | 5 | THE COURT:  Thank you, sir. |
| | 6 | Any further witnesses for the defense? |
| | 7 | MR. FISH:  No, Your Honor. |
| | 8 | THE COURT:  Anything further from the government? |
| | 9 | MS. PREWITT:  No, Your Honor. |
| 02:54 | 10 | THE COURT:  Any closing argument? |
| | 11 | MR. FISH:  Yes, Your Honor.  Who would you like to go |
| | 12 | first? |
| | 13 | THE COURT:  We'll start with the government. |
| | 14 | Actually, it's your motion.  I'll let you go first.  Let's get |
| 02:54 | 15 | him connected. |
| | 16 | THE INTERPRETER:  Okay.  Ready. |
| | 17 | MR. FISH:  We've alleged three due process violations. |
| | 18 | I think it's clear Mr. Nunez-Soberanis' due process rights were |
| | 19 | violated during his expedited removal proceedings.  First, the |
| 02:55 | 20 | Ninth Circuit's case in Tejeda-Mata makes it clear -- |
| | 21 | THE COURT:  I'm going to stop you.  I'm going to kind |
| | 22 | of tell you where I stand on this, and that might help direct |
| | 23 | both of your closing arguments. |
| | 24 | On the one hand, I think your client did himself a |
| 02:55 | 25 | disservice because he basically admitted that he spoke English |

1   and was asked whether he wanted to speak English or Spanish and

2   said English, so I have some concerns about that.

3       But I can tell you my biggest concern in this case is

4   Officer Yim.  I barely understood what he was saying.  He spoke

02:55   5   in accented English.  I had difficulty understanding him.  The

6   defense attorney had difficulty understanding him.  You asked

7   him a couple times, Ms. Prewitt, to repeat himself because you

8   had difficulty understanding him.  The court reporter had to

9   interrupt the proceedings and asked him to repeat himself.

02:55   10      It is his second language even.  If he speaks English, it

11   is his second language, and I have some real concerns if you

12   have someone who speaks in heavily accented English whether

13   that person really understands what's going on.

14      So that's sort of my -- before you start getting into a lot

02:56   15   of the argument, that's sort of where I stand, Mr. Fish, is

16   after the evidentiary hearing, so you can take that as you want

17   and go back to your closing argument, if you want.

18          MR. FISH:  I would agree with the Court there,

19   Your Honor.

02:56   20      I think the testimony also made it clear that

21   he -- Officer Yim did not, in fact, read the statement to him,

22   but asked him to read it.  So that was the declaration stated,

23   that Mr. Nunez-Soberanis was asked to read it, and I think

24   our -- you know, our declaration, and Mr. Nunez-Soberanis'

02:56   25   testimony, makes it clear that he does speak some English.  The

1    question is whether he speaks enough English to do a court

2    proceeding.  This Court would not have people come in, we just

3    ask them if they speak any English, and then we do the entire

4    change of plea or trial, or whatever proceeding it might be, in

5    English.

6       And it's important to understand the context here.  This

7    was basically presented to Mr. Nunez-Soberanis as an interview.

8    From the agent's testimony, there was no testimony that he

9    would have been informed that this was a deportation

10   proceeding, that this would have further collateral

11   consequences in the future, that this was -- this is a

12   deportation proceeding, as the Ninth Circuit makes clear in

13   Raya-Vaca.  This is a legal proceeding to which the due process

14   clause applies.  So if this had happened in a courtroom, even

15   an immigration courtroom where the person comes in, is asked,

16   "Well, do you speak English?" and then the entire proceeding

17   happens in English irrespective of their English ability,

18   irrespective of if they understand what's happening.  We would

19   say that's a clear due process violation, and we would say

20   that's also true here, especially in light of what Your Honor

21   has noticed with the limited ability of Mr. Yim to even be

22   understood by a native English speaker.

23      So I would say that there is a clear due process violation

24   here and that we should, therefore, be able to litigate the

25   prejudice issue and compel discovery of the Officer's Reference

1   Tool.

2          THE COURT:  Ms. Prewitt.

3          MS. PREWITT:  Yes, Your Honor.  I'll begin with

4   Sanchez-Aguilar in which the Ninth Circuit has held that

02:58   5   individuals who are seeking entry at the border are entitled to

6   whatever process Congress provides.

7          Now, I begin with that because while the United States

8   absolutely does not dispute that an individual who is going

9   through an expedited removal should have that expedited removal

02:58   10   conducted in the language they understand.  I do begin with

11   that because it's not as broad as the due process rights that

12   we understand in a courtroom, in a criminal proceeding.  And so

13   I just wanted to make that clear.

14          With respect to the proceeding in this case, the

02:58   15   United States is troubled by the facts in this case insofar as

16   they are these:  The defendant was given an opportunity to

17   proceed in the language of his choice.  He said that he wanted

18   to proceed in English, just as he began to do in his

19   post-arrest statement in this case.  At no point during the

02:59   20   process did he state, "I don't understand you, I don't

21   understand what's going on here."  Whatever the Court may feel

22   about Officer Yim and the Court's ability to understand him,

23   the interview in this case makes clear that the questions and

24   answers flow logically.  There's not a point here where I read

02:59   25   through this, and I think, "Oh, boy, I don't think that this

1    guy" --

2              THE COURT:  What about the rights?  What about

3    explaining to him what's going on?

4              MS. PREWITT:  Your Honor, I mean, we can call

02:59  5    Officer Yim again.  My understanding of his testimony is that

6    he did read this rights advisal to the defendant.  Of course,

7    he read it to him in English, and so, you know, that doesn't

8    necessarily deal with the Court's concern --

9              THE COURT:  In heavily accented English.

03:00  10             MS. PREWITT:  -- as to whether or not he understood

11   it, but again, Your Honor, I think the due process requires

12   more than an individual who says, "I want to go in English,"

13   and then at every opportunity when he's asked, "Do you

14   understand?" he says, "Yes."  "Do you have questions?"  He

03:00  15   says, "No."  He signs documents.  He doesn't state that he's

16   uncomfortable with the process, that he would like an

17   interpreter, that he prefers to proceed in a different

18   language.  He doesn't complain at all in that process.  And so

19   because of that, we do not believe that the due process rights

03:00  20   are implicated in this case.

21             THE COURT:  Here's my concern, and I said it a couple

22   of times.  I am convinced that if Agent Yim read these rights

23   to me, even assuming he did read them, if he read these to me

24   right now, I'm not sure I would understand the rights that he

03:01  25   was reading to me.  And there's no evidence presented that

1    Mr. Nunez read English.  I don't know that he was ever asked if
2    he read English.  And in fact, the officer's testimony about
3    the way Mr. Nunez acted when given the statement to review and
4    the fact that he didn't seem to want to review it, he just
5    signed and handed it right back to him suggests he didn't read
6    what was handed to him, and the implication could be that he
7    didn't -- wasn't able to read it.  Officer Yim didn't explore
8    with him whether he read English or not.  There was not really
9    any exploration from Officer Yim as to how well Mr. Nunez spoke
10   English, how much training he'd gotten in English, and I am
11   concerned about Mr. Nunez's due process rights.
12        In light of that, I find the due process rights were
13   violated, but I don't think that gets us to the prejudice, but
14   at this point, what I will do is I'll order that the Officer's
15   Reference Tool be turned over to defense so that they can take
16   a look at it.
17            MS. PREWITT:  Your Honor, if I could just speak
18   briefly on this.
19            THE COURT:  Sure.
20            MS. PREWITT:  The Officer Reference Tool is a website.
21   So you go to the website.  It has a series of hyperlinks that
22   links to policies.
23            THE COURT:  Is it available to the defense?
24            MR. FISH:  It is not, Your Honor.  So there is, as
25   I've laid out in my briefing -- there is litigation going on in

41

1    the Washington, D.C., District Court in which the American

2    Immigration Lawyers Association, I believe that's the AILA, is

3    seeking an unredacted copy of the Officer's Reference Tool.

4         THE COURT:  Okay.  Whatever that is, that's

03:02  5    independent from this?

6         MR. FISH:  Yes.

7         THE COURT:  If the Officer's Reference Tool is

8    available online --

9         MR. FISH:  It is not.

03:02  10        THE COURT:  -- and you can help Mr. Fish access it,

11   that's fine.  Otherwise, I'd ask that you print it out and

12   provide it to him if he's not able to do that, however you want

13   to produce it.

14        MS. PREWITT:  I want to be clear that I'm

03:03  15   understanding this.  We're talking thousands of policies which

16   will cover asylum policies, border crossing policies, policies

17   for Legal Permanent Residents who commit acts that are criminal

18   at the port of entry, a whole host of policies that have

19   nothing to do with this case.

03:03  20        THE COURT:  That's fine.  Anything that doesn't have

21   to do with this case, that's not his particular case, you don't

22   have to turn over, but anything that has to do with conducting

23   the expedited removal proceedings needs to be turned over.

24        MS. PREWITT:  So those underlying policies --

03:03  25        THE COURT:  Whatever underlying policies are used on

1    how to conduct expedited removal proceedings.

2              MR. FISH:  Thank you, Your Honor.

3              THE COURT:  Okay.  We need a briefing schedule.

4              MR. FISH:  Oh, can we make it, too, that it covers

03:03   5    interpretation, too, in an interpretation hearing, expedited

6    removal proceedings?

7              THE COURT:  I don't know that you need that because

8    you've already won on that issue.

9              MR. FISH:  Okay.

03:04  10              MR. STITT:  That's a good point.

11              THE COURT:  So let's set a briefing schedule on the

12   issue of prejudice.  The issue right now is only prejudice.

13   I've already made a finding on that.

14        How much time do you need, Mr. Fish?

03:04  15              MR. FISH:  I suppose that depends on how much time it

16   takes to get the newly ordered discovery.  I think I can write

17   it pretty quickly, but --

18              MS. PREWITT:  I'll have to see how long it will take

19   to gather that.  I would ask for at least a couple of weeks.

03:04  20              THE COURT:  Okay.  So why don't we make your brief due

21   in a month.  Is that --

22              MR. FISH:  That's fine.

23              THE COURT:  That way, you can make sure you've got all

24   the documents you need, and the government's response a week

03:04  25   after that, so let's set this for a hearing in six weeks.

1          THE CLERK:   June 24th at 2:00.

2          THE COURT:   Mr. Nunez, you are ordered to be back in

3    court on June 24th at 2:00.

4          MR. FISH:   Thank you, Your Honor.

03:05    5          THE COURT:   Thank you.

6                           ---oOo---

7

8                      C-E-R-T-I-F-I-C-A-T-I-O-N

9

10        I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12

13        Dated May 13, 2019, at San Diego, California.

14

15
                              /s/ Dana Peabody_____
16                            Dana Peabody,
                              Registered Diplomate Reporter
17                            Certified Realtime Reporter

18

19

20

21

22

23

24

25