**Eric S. Fish**
California State Bar No. 280992
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Eric_Fish@fd.org

Attorneys for Defendant
JOSE LUIS NUNEZ SOBERANIS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JOSE LUIS NUNEZ SOBERANIS,<br><br>    Defendant. | CASE NO.:   18CR4781-MDD<br><br>Hon. Mitchell D. Dembin<br>Date: August 20, 2019<br>Time: 1:30 p.m.<br><br>**REQUEST TO CONTINUE MOTION HEARING; MOTION TO COMPEL DISCOVERY; MOTION FOR A PROBABLE CAUSE FINDING** |

## I. PROCEDURAL HISTORY

On October 17, a complaint was filed charging Mr. Nunez-Soberanis with the misdemeanor offense of entry without inspection under 8 U.S.C. § 1325(a)(2). On November 20, 2018, Mr. Nunez-Soberanis was arraigned on a superseding indictment charging him with unlawful entry after deportation under 8 U.S.C. § 1326. On July 11, 2019, the government moved to dismiss the felony indictment and Mr. Nunez-Soberanis was arraigned on a new misdemeanor information charging him with attempted entry at a place not designated by immigration officers under 8 U.S.C. § 1325(a)(1).

## II. REQUEST TO CONTINUE MOTION HEARING

Mr. Nunez-Soberanis requests a six-week continuance of the motion hearing in this case. Such a continuance will give the government time to arrange the discovery that is sought by the defense, including a viewing of the arrest site. It will also give the defense time to look into an issue that has recently come to the attention of defense counsel and requires further investigation.

Mr. Nunez-Soberanis has met with an immigration attorney to explore the possibility of securing lawful presence in the United States. He has an approved I-130 petition through his United States citizen brother, which was granted back in 2001. He also accepted voluntary return to Mexico in November of 2009, according to EARM search results that were produced in discovery. Given this, he may be eligible for relief under a class action settlement reached between a class of Mexican nationals represented the American Civil Liberties Union and the Department of Homeland Security in 2013. That case is *Lopez-Venegas v. Johnson*, No. CV 13-03972-JACK (PLAx), (C.D. Cal, Mar. 11, 2015). Under the terms of the settlement, Mexican nationals who accepted voluntary return to the United States between June 1, 2009 and August, 1, 2014, and who have approved I-130 petitions, are permitted to enter and remain in the United States. Defense counsel believes that this may constitute a defense to the charges here, and requests more time to examine the issue.

## III. MOTION FOR ADDITIONAL DISCOVERY

In light of the new charge, defense counsel incorporates by reference and reasserts the discovery demands previously made in its discovery motion filed at docket number 17, including the residual request. Defense counsel also makes the following additional demands for discovery:

**A.      Any information in the government's possession concerning the circumstances of Mr. Nunez-Soberanis's 2009 voluntary return.**

As explained above, Mr. Nunez-Soberanis appears to have been subjected to voluntary return in November 2009, which may qualify him for relief under the settlement agreement in *Lopez-Venegas v. Johnson*. Defense counsel requests all information and documentation concerning Mr. Nunez-Soberanis's 2009 voluntary return.

**B.      Arrest site viewing.**

On August 6, the defense received five photographs in discovery of a grassy area that defense counsel assumes to be the arrest site in this case. Given the nature of the new charge, defense counsel requests the opportunity to view and photograph the arrest site.

**C.      Information concerning whether any of the border patrol agents involved in the arrest or interrogation of Mr. Nunez-Soberanis were participants in a Facebook group containing racially inflammatory messages.**

Last month, ProPublica publicly revealed the existence of a Facebook group in which current and former Border Patrol agents "joked about the deaths of migrants, discussed throwing burritos at Latino members of Congress visiting a detention facility in Texas . . . and posted a vulgar illustration depicting Rep. Alexandria Ocasio-Cortez." A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica, July 1, 2019. At the time that ProPublica published its story, the "I'm 10-15" Facebook group consisted of approximately 9,500 members. *Id.* The "about" section of this Facebook group, called "I'm 10-15," described it as a forum where current and former employees of U.S. Customs and Border Patrol ("CBP") could post "funny, serious, or just work related" content to start discussions. Ryan Devereaux, *Border Patrol Agents Tried to Delete Racist and Obscene Facebook Posts. We Archived Them.*, Intercept, July 5, 2019. The group's "about" section emphasized, "This is where the Green Line starts, with us." *Id.*

1    Journalists linked the profiles posting some of the most degrading and violent
2    content to profiles belonging to current Border Patrol agents, including Thomas
3    Hendricks, a supervisor at the Calexico Inspection Station. *Id*. In addition to
4    publishing several articles about the Facebook group, journalists also provided
5    information and the names of many participating agents directly to officials at CBP.
6    In the days that followed, the existence of a second Facebook group with similar
7    content, called "The Real CBP Nation" was reported by CNN. Geneva Sands &
8    Nick Valencia, *2nd Customs and Border Protection-connected secret Facebook*
9    *group shows mocking images*, CNN, July 5, 2019.
10   In response to this media coverage, CBP announced that it launched an
11   investigation into the "I'm 10-15" Facebook group, noting that CBP's Standards of
12   Conduct state:
13   Employees will not make abusive, derisive, profane, or
14   harassing statements or gestures, or engage in any other conduct
15   evidencing hatred or invidious prejudice to or about one person or
16   group on account of race, color, religion, national origin, sex, sexual
17   orientation, age or disability. This includes comments and posts made
18   on private social media sites.
19   CBP Statement on Private Facebook Group Activity, July 1, 2019. A spokesperson
20   for CBP stated that several employees were placed on restricted duty as a result of
21   posts in the "I'm 10-15" Facebook group and that the "majority of employees who
22   have been positively identified" were instructed by letter to stop posting offensive
23   material. *See* ProPublica article.
24   The House Committee on Oversight and Reform also initiated an
25   investigation into the activity of Border Patrol agents in the Facebook group and
26   requested that Facebook preserve "all documents, communications, and other data"
27   related to the "I'm 10-15" Facebook group, including any deleted data, and produce
28   this information by July 9, 2019. A.C. Thompson, *Border Patrol Condemns Secret*

*Facebook Group, but Reveals Few Specifics*, ProPublica, July 10, 2019.

The defense moves to compel discovery from the government concerning the nature and extent of any involvement that the agents involved in this case may have had in either of these Facebook groups. This includes any agents involved in the apprehension, transportation, interrogation, processing, or prosecution of Mr. Nunez-Soberanis. The defense specifically requests disclosure of whether they were members of either of these Facebook groups, whether they posted to these groups, and what they posted.

The Ninth Circuit has made clear: "We cannot overemphasize the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case." *Silva v. Brown*, 416 F.3d 980, 986 (9th Cir. 2005) (citing *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993)); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). A defendant has the right to impeach a witness's credibility via cross-examination as to their potential biases and prejudices. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). ("A more particular attack on the witness's credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.").

In addition to the right to cross-examine a witness about their bias against a specific defendant, several courts, including the Ninth Circuit, recognize that a witness's bias against a class of which the defendant is a member is a relevant subject that must be subject to cross-examination. *See, e.g.*, *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998) (concluding that evidence of a witness's racial bias is a relevant subject for cross-examination under Federal Rule of Evidence 401); *United States v. Kartman*, 417 F.2d 893, 897 (9th Cir. 1969) ("Prejudice toward a group of which defendant is a part may be a source of partiality against the defendant. He is therefore entitled to a reasonable opportunity to cross-examine

1  witnesses as to the existence of any such prejudice, and its possible effect upon their
2  testimony."); *Gaines v. United States*, 994 A.2d 391, 401 (D.C. 2010) ("[A]
3  witness's racial animus or prejudice is a proper subject of bias cross-examination
4  as long as the questions posed are relevant to the witness's credibility."); *Brinson
5  v. Walker*, 547 F.3d 387, 392 (2d Cir. 2008) (finding that a defendant states a
6  violation of the Confrontation Clause by showing that he was prohibited from
7  engaging in an otherwise appropriate cross examination designed to show racial
8  bias).

9      The government is also required to disclose evidence that will allow the
10 defendant to impeach a witness whose credibility is important to the outcome of the
11 trial. *Giglio*, 405 U.S. at 154. According to the Ninth Circuit, "[i]mpeachment
12 evidence is especially likely to be material when it impugns the testimony of a
13 witness who is critical to the prosecution's case." *Silva*, 416 F.3d at 987. This rule
14 additionally obligates the government to disclose impeachment evidence bearing
15 on the witness's past misconduct. See *Milke v. Ryan*, 711 F.3d 998, 1016 (9th Cir.
16 2013) (finding that the state failed in its constitutional obligation when it did not
17 produce evidence of a testifying officer's past misconduct).

18     As has been widely reported, CBP personnel routinely used these Facebook
19 groups to post, comment on, and promote material evidencing hatred and bias
20 against both people who are noncitizens of the United States and people who are of
21 Hispanic descent. The defendant has the right to cross-examine regarding biases
22 harbored by Border Patrol agents testifying for the government. Moreover, because
23 the testifying agents are central to the government's case, the prosecution must
24 disclose all impeachment material related to the Facebook groups that will allow
25 the defendant to challenge the witnesses' credibility. This includes the disclosure
26 of the testifying agent's membership in the Facebook groups, even in the absence
27 of inflammatory posts by the individual agent, as, according to CBP policy, "Every
28 CBP employee is required to immediately report allegations of misconduct."

POINTS AND AUTHORITIES IN SUPPORT OF SUPPLEMENTAL MOTION TO COMPEL DISCOVERY

Section 5.8, U.S. Customs and Border Protection Standards of Conduct. The failure of CBP employees who were members of the Facebook groups to report the misconduct of their fellow employees was, in and of itself, misconduct that the government is required to disclose as impeachment evidence under *Giglio*.

### IV.    MOTION FOR A PROBABLE CAUSE HEARING

The government dismissed the underlying indictment in this case, and at this point is proceeding with only an information that alleges Mr. Nunez-Soberanis violated 8 U.S.C. § 1325(a)(1). There has been no probable cause finding by a grand jury or by a judge reviewing sworn testimony that Mr. Nunez-Soberanis committed that misdemeanor offense. Under the Fourth Amendment to the United States Constitution and Rule 58 of the Federal Rules of Criminal Procedure, Mr. Nunez-Soberanis cannot be deprived of his liberty unless a court finds probable cause that he has committed an offense. "[T]he Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979). Mr. Nunez-Soberanis was originally arrested on a different charge, one that has now been dismissed. Due to that arrest, he is currently subject to conditions of pretrial release that operate as a significant restraint on his liberty. He is not permitted to travel to Mexico, or to leave the State of California, and he must remain in the custody of a third-party custodian. *See* Dkt. 6 (conditions of release). The defense therefore demands a preliminary hearing with witness testimony so that a probable cause determination can be made on the current charge.

### V.    CONCLUSION

For the foregoing reasons, Mr. Nunez-Soberanis requests that the Court grant the above motions.

|   |   |
|---|---|
| | Respectfully submitted, |
| Dated: August 6, 2019 | *s/ Eric Fish* <br> Federal Defenders of San Diego, Inc. <br> Attorneys for Defendant <br> JOSE LUIS NUNEZ SOBERANIS <br> Email: Eric_Fish@fd.org |