1               United States District Court

2          for the Southern District of California

3
                                    )
4   UNITED STATES OF AMERICA,       )
                                    )   No. 18cr4781-MDD
5        Plaintiff,                  )
                                    )   September 25, 2019
6           v.                       )
                                    )   San Diego, California
7   JOSÉ LUIS NUNEZ-SOBERANIS,       )
                                    )
8        Defendant.                  )
                                    )
9

10              TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE MITCHELL D. DEMBIN
11              United States District Judge

12  APPEARANCES:

13  For the Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                            ERIC R. OLAH
14                          Assistant United States Attorney

15  For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
                            ERIC STUDEBAKER FISH
16                          RYAN W. STITT
                            Attorneys at Law
17

18

19

20

21
    Court Reporter:         Dana Peabody, RDR, CRR
22                          District Court Clerk's Office
                            333 West Broadway, Suite 420
23                          San Diego, California 92101
                            DanaPeabodyCSR@gmail.com
24

25

1   Case:  USA v. NUNEZ-SOBERANIS
    Date:  September 25, 2019
2

3
                          INDEX OF WITNESSES
4
    FOR THE PLAINTIFF:
5                                         E X A M I N A T I O N
                                    DIRECT  CROSS REDIRECT RECROSS
6
    Miguel Muñoz
7   Mr. Olah                          11                 31
    Mr. Fish                               23
8
    Steven Cabrera
9   Mr. Olah                          34

10

11

12
                          INDEX OF EXHIBITS
13

14          GOVERNMENT'S EXHIBITS          EVIDENCE

15             1                              21

16             2                              21

17             3                              22

18

19

20          DEFENSE EXHIBITS               EVIDENCE

21             C                              27

22             D                              27

23             E                              28

24             G                              30

25             N                              29

1          San Diego, California, September 25, 2019

2                          *   *   *

3          THE CLERK:  Counsel, please state your appearances.

4      Calling matter number 1 on calendar, 18cr4781, USA versus

01:30    5  José Nunez-Soberanis, and we're on for a bench trial.

6          MR. FISH:  Good afternoon, Your Honor.  Eric Fish of

7      the Federal Defenders with Mr. Nunez-Soberanis, who, as always,

8      is present on bond.

9          THE COURT:  Thank you.

01:30   10         MR. FISH:  Also joined by co-counsel Ryan Stitt.

11         MR. OLAH:  Eric Olah on behalf of the United States.

12         THE COURT:  Thanks.

13     First, I reserved for today motions to suppress statements.

14     You can be seated now.  I have had the opportunity to review

01:31   15  the papers as well as the exhibits supplied.  I'll make

16     a -- and to give the parties some guidance as to how it's going

17     to proceed, my tentative ruling is consistent with all of the

18     cases regarding field reports; that those will be admissible

19     unless something happens in the course of the evidence that

01:31   20  changes my mind.  You can count on the fact that field

21     statements will be coming in.  The motion to suppress

22     statements otherwise is slightly more problematic.  The

23     government has decided that it will not introduce statements

24     during the expedited removal nor will it seek to introduce the

01:31   25  statement of alienage that preceded the Miranda warnings in the

01:32

01:32

01:33

01:33

01:34

1   custodial interview that's provided in Exhibit C of the defense

2   package.  The government does, however, seek to introduce other

3   statements made post-Miranda that do not relate to alienage.

4       And that position would be fine except for the fact that

5   the government's response doesn't directly address the San Juan

6   Cruz issue.  The defense moved to suppress the Mirandized

7   statements if they occurred after the expedited removal

8   proceeding because that did not have Miranda warnings.

9       The government's agreement not to seek to introduce the

10  expedited removal statements doesn't solve the problem.  The

11  question remains:  When did the expedited removal proceeding

12  take place in relation to the Mirandized statement?

13      There are a couple of references that suggest that the

14  Mirandized statement occurred second, not first.  For example,

15  in the expedited removal statement, the defendant was asked,

16  were you advised of your consulate rights, and he says yes.

17  That advisal appears to occur in the Mirandized statement, so

18  that may have preceded it.

19      And also, in the government's paperwork, the government

20  says the U.S. will seek to admit only defendant's post-Miranda

21  statements such as those enumerated above which were not

22  preceded by an expedited removal proceeding.  So it's sort of

23  not the best phrasing, and I need to know.  We need to know

24  when -- in what order what occurred.

25          MR. OLAH:  Yes, Your Honor.  I apologize for the

1    ambiguity.  I would cite to the bottom of page 6 of the

2    government's response, which basically says the Miranda

3    interview did not follow the ER proceeding.  Agent Cabrera is

4    here today.  He's happy to testify.  He explained to me this

01:34    5    morning that there essentially was no admin interview.  He

6    advised the individual of his Miranda rights, conducted the

7    Miranda interview -- that is video-recorded -- and then used

8    those responses for purposes of the sworn statement.  There was

9    not a double interview.  It was a single interview, and it was

01:34   10   Mirandized, so he basically went with the advisal that bestows

11   more rights on the defendant and makes today's testimony

12   admissible.

13          THE COURT:  So what you're saying is that the evidence

14   will show that the interview in Exhibit C preceded the filling

01:35   15   out of the form that is Exhibit B?

16          MR. OLAH:  Correct, and I don't intend to introduce

17   Exhibit B, for what it's worth.

18          THE COURT:  Again, that's not the question.

19          MR. OLAH:  Sure.

01:35   20          THE COURT:  You couldn't anyway.

21          MR. OLAH:  I think I could try.

22          THE COURT:  Well, you could try.

23      But I will tentatively admit the post-Miranda statements

24   other than those related to alienage if the evidence comes as

01:35   25   the government says and the Miranda warnings preceded the

1   filling out of the expedited removal form, Exhibit B.  So I

2   just want the parties to have some guidance as to how I was

3   going.

4       You look confused, Mr. Stitt.  Or is that just the way you

5   look?

6             MR. STITT:  It could be just the way I look.

7       I guess I am a little confused about that, but we can

8   address it on cross.

9       There is one preliminary matter I wanted to address just

10   briefly.  It is our request for a continuance of today's trial.

11   I understand that the Court is likely to deny that.  The reason

12   for our request is the pending interlocutory appeal that

13   addressed the protective order that we were not able to

14   challenge before Judge Bashant and then file the motion here to

15   lift the protective order and then appealed the Court's ruling.

16   I have some concern that that appeal only remains ripe for

17   Mr. Nunez pending final judgment, and so if the Court reaches a

18   final judgment today, whether it's an acquittal or a

19   conviction, then there's some concern that that appeal then may

20   not have an opportunity to get ruled on and that Judge Bashant

21   would lose jurisdiction.

22       That argument or that concern is at odds with what the

23   government has represented before Judge Bashant.  The

24   government's response on appeal is that Judge Bashant only has

25   jurisdiction pending final judgment, and so essentially the

1   final judgment as rendered today loses jurisdiction that she

2   would otherwise lack.

3       My concern is that the government certainly can change its

4   opinion, and so requiring Mr. Nunez to go to trial before we

01:37   5   get a ruling on an, arguably, collateral issue in his case does

6   put him in the position where he would potentially lose the

7   right for a ruling by going forward today, and that's the

8   reason we would request the continuance.

9       I think it can be cured also if Mr. Olah, as government

01:37   10   counsel in that matter as well, will represent that he will not

11   change his position and argue that Judge Bashant now, you know,

12   as of tomorrow, lacks jurisdiction to adjudicate the appeal

13   because there is, in fact, a final judgment.  He certainly has

14   briefed the opposite, but unless the government, I think, is

01:37   15   going to assure Mr. Nunez that they're not going to essentially

16   force him to trial early and then sort of say that -- you know,

17   pull the rug out from under his appeal and change their

18   position in the future, I think that that does create some

19   concern.

01:37   20       Mr. Nunez is obviously out of custody.  There is no Speedy

21   Trial Act for this type of offense, and so I don't think that

22   the public has a strong right to a prompt trial.  There is this

23   pending legal issue, and I do think it would -- it would be

24   beneficial to Mr. Nunez to get a ruling on that and to protect

01:38   25   that right that he has to adjudication of that issue and that

01:38

1   that would be a reason to continue the trial albeit for likely

2   a short period of time.  The brief is done with Judge Bashant.

3   I don't believe that there's further briefing, so that would be

4   my request.

01:38

5       I know I talked to Mr. Olah about this earlier.  He did not

6   have a final decision.  I know that this puts him in a

7   difficult spot where he's in a position where he needs to

8   concede something on the record.  I don't know if he's prepared

9   to do that.  But I'd like to see Mr. Nunez's appeal adjudicated

01:38

10  and -- before losing that opportunity.

11          THE COURT:  So anything you want to add?

12          MR. OLAH:  Just I think I misheard, but just to make

13  clear the government's position -- I think there's five pages

14  of our appeal dedicated to this very position, and that's the

01:39

15  district court does not have jurisdiction until there is a

16  final judgment.  We are not taking the position that the

17  district court judge only has jurisdiction until there's a

18  final jurisdiction.  That is incorrect, and I think that's what

19  I heard.

01:39

20      To the extent that Your Honor has already ruled that the

21  document that they wish to publicly disseminate has no

22  relevance to this case, they now take that position on appeal,

23  they concede that very point, so I don't see the need for a

24  continuance for a document that they've conceded has no

01:39

25  relevance to the trial today.

01:39

01:40

01:40

01:40

01:41

1     To the extent Mr. Stitt has asked me to make a concession

2  minutes before we came out today, I stand by what I told him,

3  and that's if he's worried about the government flip-flopping

4  on its issue, despite writing five pages saying that the Court

5  doesn't have jurisdiction until there's a final judgment and

6  once there's a final judgment saying the Court no longer has

7  jurisdiction, then throw my five pages back in my face.  Right?

8  That's a great appeal to write.  I'm not willing to concede an

9  argument that I haven't thoroughly researched or a proposal

10  that I haven't thoroughly researched moments before I start a

11  bench trial, and I see no need for a continuance at this time.

12     THE COURT:  I'm going to deny the motion for a

13  continuance.  I did read the government's papers.  What

14  Mr. Olah said is consistent that the -- he believes or the

15  government's position is that Judge Bashant obtains

16  jurisdiction with final judgment, not loses it.

17     And of course, the question of jurisdiction is one for the

18  Appellate Court, in this case Judge Bashant.

19     And regardless, the fact remains that I found that this

20  document has no bearing on this trial one way or another.  If

21  that were not the case, perhaps this would be different.  It is

22  a collateral issue.  I appreciate the significance of it to the

23  Federal Defenders office, but not to Mr. Nunez.

24     That said, are the parties ready to proceed?

25     MR. STITT:  Yes, sir.

```
 1          MR. FISH:  Yes.
 2       One more housekeeping matter.  I wanted to verify that
 3    Henthorn checks were done on all of the witnesses.
 4          THE COURT:  I'm going to let Mr. Olah state whether or
 5    not the government has complied with its discovery obligations.
 6          MR. OLAH:  It has, Your Honor.
 7          THE COURT:  That's the answer.
 8       With that, let's get started.  The government's welcome to
 9    open or not.
10          MR. OLAH:  One sentence.  The government will be
11    presenting two witnesses to prove four elements beyond a
12    reasonable doubt.
13       The first witness is border patrol Agent Miguel Muñoz.
14          MR. FISH:  In case we weren't clear, the defense
15    waives its opening.
16          THE COURT:  Or you can defer.
17          MR. FISH:  We defer our opening.
18          THE COURT:  I assumed you were going to.  I apologize
19    for not making it clear.  That's on me.
20                        MIGUEL MUÑOZ,
21                   GOVERNMENT'S WITNESS, SWORN
22          THE CLERK:  Would you state and spell your full name
23    for the record.
24          THE WITNESS:  Miguel Muñoz, M-U-N-O-Z.
25          THE CLERK:  Thank you.  Please be seated.
```

01:41 (line 5)
01:41 (line 10)
01:41 (line 15)
01:41 (line 20)
01:42 (line 25)

1          THE WITNESS:  Thank you.

2                    DIRECT EXAMINATION

3    BY MR. OLAH:

4    Q.   Good afternoon, Agent Muñoz.

01:42    5    A.   Good afternoon, sir.

6    Q.   Where do you work?

7    A.   I work for the U.S. Border Patrol, El Cajon station.

8    Q.   How long have you worked for the United States Border

9    Patrol?

01:42   10    A.   A little over 22 years, sir.

11    Q.   Okay.  What's your current title?

12    A.   Supervisory border patrol agent.

13    Q.   How long have you held that supervisory title?

14    A.   Almost ten years, sir.

01:42   15    Q.   What's your current area of responsibility?

16    A.   My current area of responsibility is the area east of

17    Tecate, California, and west of Campo, California, out in the

18    far East County.

19    Q.   Does that area of responsibility have a conventional name?

01:43   20    A.   We just assign them to specific zones, sir, like Zone 27,

21    Zone 28, but it's just the El Cajon -- El Cajon station area of

22    responsibility.

23    Q.   How long have you been in that area of responsibility?

24    A.   For about 21 of my 22 years.

01:43   25    Q.   What did you do prior to joining the United States Border

1   Patrol?

2   A.   I worked with the El Paso County Sheriff's Office.

3   Q.   For how many years?

4   A.   A little less than four years, sir.

01:43   5   Q.   Are you familiar with seismic intrusion devices?

6   A.   Yes, sir, I am.

7   Q.   Can you explain what they are?

8   A.   A seismic intrusion device is a sensor which picks up foot

9   traffic.  Typically they're planted adjacent to a smuggling

01:43   10   trail where we know there's a lot of cross-border activity.

11           MR. FISH:  Objection, Your Honor.  First, he's not

12   been certified as an expert of any kind in seismic intrusion

13   devices; and second, he's testifying about the nature of the

14   area.

01:44   15           THE COURT:  Overruled.

16   BY MR. OLAH:

17   Q.   You can complete your answer.

18   A.   So the seismic intrusion devices are placed along smuggling

19   trails where they pick up foot traffic.  Once it picks up that

01:44   20   traffic, a message is sent from the seismic intrusion device to

21   our dispatch, and then our dispatch will radio that the device

22   has gone off and the total number of hits or activations.

23   Q.   Who would that radio go out to?

24   A.   That will come from our border patrol dispatch to the

01:44   25   agents out in the field.

1   Q.   Okay.   Were you working out in the field on October 16,

2   2018?

3   A.   Yes, sir, I was.

4   Q.   And did you respond to a seismic intrusion device

01:44   5   activation that afternoon?

6                   MR. FISH:   Objection, Your Honor.   Hearsay.

7                   THE COURT:   Overruled.

8                   MR. FISH:   If I can -- they haven't laid a foundation.

9                   THE COURT:   It's not offered for the truth of the

01:44   10   matter.   It's why he was in the area.

11                   MR. FISH:   Okay.

12   BY MR. OLAH:

13   Q.   Approximately what time did you respond to the seismic

14   intrusion device on October 16, 2018?

01:45   15   A.   Our dispatch called out the activation of the seismic

16   intrusion device around 4:46 p.m.

17   Q.   And what time did you arrive at the device?

18   A.   A matter of minutes after, maybe four minutes.

19   Q.   Can you describe the general location of the activated

01:45   20   device in this case?

21   A.   Yes, sir.   It's on the trail.   It's in the rural,

22   mountainous area, a lot of brush.   Not many hiking trails in

23   that area.   It's within close proximity to the U.S./Mexican

24   border, and yes, I responded to the trail where I observed

01:45   25   several footprints along the trail.   It looks like they were

1    going north.

2    Q.   How close is this device to the United States/Mexico

3    border?

4    A.   Approximately a mile north of the U.S./Mexico border.

01:45    5         THE WITNESS:   That's going up and down the hills,

6    Your Honor.

7    BY MR. OLAH:

8    Q.   And how long would it take to travel from the border fence

9    to that activation device on foot?

01:46   10    A.   If you're moving, probably about an hour.   Now, please bear

11    in mind that there's a lot of brush again, a lot of boulders, a

12    lot of -- the terrain is rather rugged and difficult.   Most

13    people crossing the border will make it probably within about

14    two hours.   That's been my experience.

01:46   15    Q.   Is the border fence that's approximately one mile -- is

16    that your testimony, it's a mile away?

17    A.   Yes, sir.

18    Q.   Is that border fence a port of entry?

19    A.   No, sir.

01:46   20    Q.   Is it an area designated for entry by immigration officers?

21         MR. FISH:   Objection.   This calls for a legal

22    conclusion.

23         THE COURT:   Overruled.

24         THE WITNESS:   No, sir.

25

BY MR. OLAH:

Q.   What port of entry is the closest to the seismic intrusion device that was activated in this case?

A.   That would be the Tecate, California, port of entry, sir.

Q.   And how far away is it?

A.   Approximately eight miles west of the seismic intrusion device.

Q.   And that's the nearest port of entry, eight miles away?

A.   Yes, sir.

Q.   What does the term "smuggling trail" mean to you?

A.   It's a trail used by -- typically by illegal aliens or drug smugglers to make their way north into the United States from Mexico to be -- typically to cross into the country undetected.

Q.   Would you consider the seismic intrusion device that was activated on October 16th of last year to be on a smuggling trail?

        MR. FISH:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. OLAH:

Q.   Have you made prior apprehensions stemming from activations of this seismic intrusion device?

A.   Yes, sir.

Q.   Approximately how many?

A.   Numerous.  It would be hard to tell.  With 20-plus years, quite a few people.

1    Q.   On October 16th, did you report to this activated device?

2    A.   Yes, sir, I did.

3    Q.   Were you originally in a vehicle of some sort?

4    A.   Yes, sir, I was in my marked border patrol agent vehicle,

01:48   5    lights and sirens.

6    Q.   Were you able to drive up to the device or did you exit

7    your vehicle at some point?

8    A.   No, sir, I made my way a little bit east of the device at a

9    turnout, maybe about 30 yards east of where the trail comes out

01:48   10   to State Route 94, and I made my way west towards the trail

11   itself.

12   Q.   Okay.  Did you report to where you know the device to be?

13   A.   Yes, sir, I started making my way south on the trail, and

14   as soon as I hit the trail, I could see foot sign -- or

01:48   15   footprints headed north.

16   Q.   And did you follow those footprints?

17   A.   Yes, sir, it wasn't too far.  I followed it to where I saw

18   several individuals hiding underneath the large bush or brush.

19   Q.   How many individuals?

01:49   20   A.   I saw three.

21   Q.   What did you do upon seeing these three individuals?

22   A.   I identified myself in the Spanish language as being border

23   patrol.

24   Q.   How far were they from the activated intrusion device?

01:49   25   A.   Approximately 30 -- 20 to 30 yards, sir, north of it.

1   Q.   North of the device that had been activated?

2   A.   Yes, sir.

3   Q.   What did you do upon seeing these individuals?

4   A.   Again, I identified myself as a U.S. Border Patrol agent.

01:49   5   Q.   And was that in English or in Spanish?

6   A.   That was in Spanish, sir.

7   Q.   Are you a native Spanish-speaker?

8   A.   Yes, sir, I am.

9   Q.   Have you used Spanish as a border patrol agent for the last

01:49   10   22 years?

11   A.   Yes, sir.

12   Q.   Did you ask these individuals any questions?

13   A.   I asked them for their citizenship and if they had any

14   immigration documents or passports on them.

01:49   15   Q.   And did each individual provide answers to those questions?

16          MR. FISH:   I object to the answers on hearsay grounds

17   and on the grounds in particular that it's not been established

18   that Officer Muñoz is a language conduit; that is, that he can

19   properly interpret for us their answers in Spanish.   And the

01:50   20   authority I would cite is United States versus

21   Zemian (phonetic), a Ninth Circuit --

22          THE COURT:   I'll overrule that objection.   Mr. Muñoz

23   has stated that he's a native speaker in Spanish, so his

24   language skills, I think, are not subject to question.   I will

01:50   25   sustain the objection, though, as to answers made by persons

1    other than Mr. Muñoz because that would be hearsay.  As to

2    Mr. Muñoz, they are admissions of a party defendant.

3    BY MR. OLAH:

4    Q.   Do you see one of the three individuals that you

5    encountered in court today?

6    A.   Yes, sir, I do.

7    Q.   Can you please identify him by an article of clothing?

8    A.   He's the gentleman in the white shirt there.

9         MR. OLAH:  Let the record reflect that the witness has

10   identified the defendant José Nunez-Soberanis.

11        THE COURT:  Mr. Stitt is also wearing a white shirt.

12   BY MR. OLAH:

13   Q.   Is the individual wearing a shirt or a suit with a white

14   shirt?

15   A.   The black earphones.  The white shirt has several stripes

16   on it.  I believe they're green.  And he's sitting between the

17   two gentlemen at the defense counsel.

18        MR. OLAH:  Is that it?  Your Honor, same request.

19        THE COURT:  I think we've managed this time.  Thank

20   you.

21        THE WITNESS:  Thank you, Your Honor.

22   BY MR. OLAH:

23   Q.   Focusing on your questioning of that individual that you've

24   just identified as the defendant, did you ask about his

25   citizenship?

1   A.  Yes, sir, I did.

2   Q.  What was his response?

3   A.  His response was, "Mexico."

4   Q.  Did you ask if he had any immigration documents that would

01:51  5   allow him to enter the United States that day?

6   A.  Yes, sir, I did.

7   Q.  Did he provide an answer?

8   A.  He said he didn't have any.

9   Q.  Did he provide any such documentation?

01:51  10   A.  No, sir.

11   Q.  Did you ask when he had entered the United States that day?

12   A.  Yes, sir, I recall he said he had crossed that same day.

13   Q.  Okay.

14        MR. OLAH:  Turning to the exhibits, Danielle, can you

01:52  15   unlock the screen, please?

16        THE CLERK:  Sure.

17        MR. OLAH:  So for the record, there are hard copies of

18   the three exhibits the government intends to introduce.

19   They've been provided to defense counsel, one on the witness

01:52  20   stand, one, I believe, with Your Honor, and two with your

21   staff.

22   BY MR. OLAH:

23   Q.  Since I have also pulled it up on the monitor, Agent Muñoz,

24   feel free to use either the monitor or the hard copy that's

01:52  25   before you.  I'll represent that this has been premarked as

1    Exhibit 1.

2        Do you recognize that image?

3    A.   Yes, sir, it's a picture of me near the seismic intrusion

4    device.

01:52    5    Q.   That was activated on October 16th?

6    A.   Correct.

7    Q.   Where is the United States/Mexico border fence from where

8    you're standing in this picture?

9    A.   Again, approximately a mile south.  If you look at the

01:52    10   picture, at the very top of it, you'll see several power

11   towers.  Right around here and there.  From where those power

12   towers are, Your Honor, approximately another 100, 150 yards

13   south of those power towers is the U.S./Mexico border.

14   Q.   And the terrain from those towers to where you're standing

01:53    15   in this image, can you provide a general description?

16   A.   From that area north, very rugged, again, very rocky.  The

17   trails are very difficult to manage.  Quite often you run into

18   rattlesnakes and ticks, and it is very difficult terrain to

19   navigate.

01:53    20   Q.   Is the image we're looking at a fair and accurate depiction

21   of the general area of this seismic intrusion device?

22   A.   Yes, sir, it is.

23       MR. OLAH:  Your Honor, I'd move to admit Exhibit 1

24   into evidence.

01:53    25       THE COURT:  Any objection?

```
 1            MR. FISH:  No objection.

 2            THE COURT:  Admitted.

 3        (Government's Exhibit 1 admitted.)

 4   BY MR. OLAH:

 5   Q.   Turning to what's been premarked as Exhibit 2, do you

 6   recognize that image, Agent Muñoz?

 7   A.   Yes, sir, it is a picture of me off State Route 94 within

 8   close proximity to where the smuggling trail exits onto the

 9   highway.

10   Q.   Can you, as you did with the last image, circle where that

11   smuggling trail is?

12   A.   The smuggling trail exits right around here.

13   Q.   Okay.  And can you also circle the shrubs that you

14   encountered these three individuals, including the defendant,

15   in that day?

16   A.   Yes, sir.  The brush where the individuals were encountered

17   is right here.  It's rather hidden from the highway.

18   Q.   Is this a fair and accurate depiction of the apprehension

19   site?

20   A.   Yes, sir, it is.

21            MR. OLAH:  Your Honor, I'd move to admit Exhibit 2.

22            THE COURT:  Any objection?

23            MR. FISH:  No.

24            THE COURT:  Admitted.

25        (Government's Exhibit 2 admitted.)
```

1    BY MR. OLAH:

2    Q.   Turning to Exhibit 3, Agent Muñoz, do you recognize that

3    image?

4    A.   Yes, sir.

01:55    5    Q.   What are we looking at?

6    A.   It's a picture of me -- it's rather difficult to see me

7    since I'm dressed in green -- there at the location where I

8    encountered the three individuals north of the seismic

9    intrusion device and south of State Route 94.

01:55   10    Q.   So where you're positioned in this picture is where you

11   found the three individuals?

12   A.   Yes, sir, laying down.

13   Q.   And they were laying down?

14   A.   Yes, sir.

01:55   15   Q.   Is this a fair and accurate depiction of the apprehension

16   site?

17   A.   Yes, sir, it is.

18           MR. OLAH:   I'd move to admit Exhibit 3 in evidence.

19           THE COURT:   Any objection?

01:55   20           MR. FISH:   No objection.

21           THE COURT:   Admitted.

22       (Government's Exhibit 3 admitted.)

23   BY MR. OLAH:

24   Q.   Did you encounter these three individuals within the

01:55   25   Southern District of California?

```
 1   A.  Yes, sir, I did.
 2          MR. OLAH:  No further questions at this time,
 3   Your Honor.
 4          THE COURT:  All right.  Thank you.
 5      Mr. Fish.
 6          MR. FISH:  Thank you, Your Honor.
 7                   CROSS-EXAMINATION
 8   BY MR. FISH:
 9   Q.  Good afternoon, Agent Muñoz.
10   A.  Good afternoon, sir.
11   Q.  So I want to begin by talking about your encounter with
12   these three people.
13   A.  Yes.
14   Q.  You first found -- you first found these three people at
15   about 4:46 p.m.?
16   A.  No, sir, 4:46 is the time I responded to the seismic
17   intrusion device.  I'd say about four minutes after it went off
18   as I was on State Route 94 is when I parked and made my way
19   south on to the trail.
20   Q.  So that would be around 4:50 p.m.?
21   A.  Roughly, yes, sir.
22   Q.  And you located them shortly after that?
23   A.  I made my way south on the trail.  The trail from the
24   pictures, as you've seen, is rather sandy, that one wash area.
25   So picking up -- excuse me -- footprints is rather easy, and
```

1    from there, you could track them towards the lay-up and see

2    that the individuals were there and that's what happened.

3    Q.   And you arrested these individuals at 4:52 p.m.?

4    A.   Yes, sir, as I recall, 4:52.

01:57   5    Q.   So the entire encounter lasted two minutes or less?

6    A.   For the encounter from when I ran into -- or when I saw

7    them to when I identified myself in the terminated image,

8    approximately maybe two, three minutes.

9    Q.   How many other apprehensions did you make that day?

01:57   10   A.   For that day?  None that I recall, sir.

11   Q.   None that you recall.  How many would you make on a typical

12   day?

13   A.   On a typical day, as a supervisor, it varies, sir.  It

14   depends on whether we make it out to the field or we're working

01:57   15   at the processing center.  Supervisors don't get the leeway

16   that the field troops, especially in light of recent activity.

17   Q.   So you don't specifically recall how many other

18   apprehensions you made that day?

19   A.   For that day?

01:57   20   Q.   Yes.

21   A.   Those three individuals, sir.

22   Q.   So you have other duties besides arresting people in the

23   field?

24   A.   Yes, sir, managing agents, making sure that everything runs

01:58   25   smoothly for cases, that type of thing.

1    Q.   When did your shift start that day?

2    A.   It does fluctuate, but I believe it started at 11:00 in the

3    morning.

4    Q.   How long does your shift last?

01:58  5    A.   It is typically a ten-hour shift.  Eight hours work and

6    then two hours of what is called BPAPRA.

7    Q.   What was the last part?

8    A.   Two hours of overtime.  They call it BPAPRA.  So a total of

9    ten hours.

01:58  10    Q.   A total of ten hours?

11    A.   Yes, sir.

12    Q.   So you spoke with these three people as a group?

13    A.   Yes, sir.

14    Q.   And they were under the tree when you spoke with them,

01:58  15    right?

16    A.   I believe I had started pulling them out from underneath

17    the brush or from underneath the bushes, which is standard

18    because you've got to see their hands, officer safety, that

19    type of thing, sir.

01:59  20    Q.   You spoke to them, as you testified, in Spanish?

21    A.   Yes, sir.

22    Q.   Now, you testified that you're a native Spanish-speaker.

23    Did you -- have you ever received any certification to

24    translate things -- translate from English into Spanish or

01:59  25    Spanish into English?

```
 1   A.   No, sir.

 2   Q.   Have you ever been trained as a court interpreter?

 3   A.   No, sir, I have not.

 4        THE COURT:  Let's take a quick recess.

 5        (Recess.)

 6        THE COURT:  Sorry for the interruption.  Because our

 7   audio system is on, apparently we're picking up a telephone

 8   call in Judge Goddard's chambers, so I think we have fixed

 9   that.  I'm sorry for the interruption, Mr. Fish.

10   BY MR. FISH:

11   Q.   So I believe where I was, so you've never been certified or

12   otherwise trained in Spanish-to-English or English-to-Spanish

13   interpretation.  Is that right?

14   A.   No, sir, I've not.

15   Q.   So I finally want to talk about this area.  You testified

16   that you work in this area.  This is the area where

17   you -- you're stationed?

18   A.   Yes, sir, that's -- that was my assigned area.

19   Q.   There are buildings in this area, correct?

20   A.   The area has a couple of homes in the area.  It's very

21   sparse.  A lot of ranches, but still very rocky and

22   mountainous.  Only a few homes.

23   Q.   So there are -- so there are homes and ranches in the area?

24   A.   A couple of homes and then ranches as well, yes, sir.

25   Q.   Okay.
```

1    MR. FISH:  Can I please pull up Exhibit C?

2  BY MR. FISH:

3  Q.  So do you recognize this building?

4  A.  Yes, sir.  That is the house which is east of the smuggling

02:01    5  trail in Campo, California.  I'd say about from the trail

6  itself, probably 150 yards to the east.

7  Q.  Is this a fair and accurate representation of that house?

8  A.  Yes, sir.

9    MR. FISH:  I would ask to admit Defense Exhibit C.

02:02   10    THE COURT:  Any objection?

11    MR. OLAH:  None, Your Honor.

12    THE COURT:  Admitted.

13    (Defense Exhibit C admitted.)

14  BY MR. FISH:

02:02   15  Q.  Can I see Exhibit D?

16    Do you recognize the buildings in this photograph?

17  A.  Yes, sir, they appear to be the same building.

18  Q.  And is this a fair and accurate representation of that

19  building?

02:02   20  A.  That is correct.

21    MR. FISH:  I would ask to admit Defense Exhibit D.

22    THE COURT:  Any objection?

23    MR. OLAH:  None.

24    THE COURT:  Admitted.

02:02   25    (Defense Exhibit D admitted.)

BY MR. FISH:

Q.   And so this area is right next to the 94 highway, correct?

A.   Right off the State Route 94, just a little south of it, sir, that is correct.

02:02          MR. FISH:  Could I please have Defense E?

BY MR. FISH:

Q.   Do you recognize this stretch of road?

A.   This is from up on top -- we're looking from the south of State Route 94 northbound towards 94 and then

02:03   continuing -- that's looking north, sir.

Q.   And is this a fair and accurate representation of that stretch of road?

A.   It is.

          MR. FISH:  I'd ask to admit Defense E.

02:03          MR. OLAH:  No objection, Your Honor.

          THE COURT:  Admitted.

     (Defense Exhibit E admitted.)

          MR. FISH:  Could I see F?

BY MR. FISH:

02:03   Q.   You recognize this?

A.   Yes, sir.  As I recall, this is the area just a little bit east of the smuggling trail, exits onto State Route 94, and it's looking north toward an area that we commonly call the chicken ranch.

02:03   Q.   The chicken ranch?

1    A.   Yes.

2    Q.   Is that because there's a chicken ranch there?

3    A.   There used to be a chicken ranch there.  I don't know if

4    it's operational anymore.

02:03    5    Q.   Is this a fair and accurate representation of that stretch

6    of road?

7    A.   Yes, sir.

8         MR. FISH:  I'd ask to admit Defense N.

9         MR. OLAH:  No objection from the government.

02:03    10        THE COURT:  Admitted.

11        (Defense Exhibit N admitted.)

12   BY MR. FISH:

13   Q.   Is there a school bus stop nearby this area?

14   A.   As I recall, sir, it is east of the -- of that property

02:04    15   closer to the entrance of the chicken ranch, yes, sir.

16        MR. FISH:  Could I please see Defense G?

17   BY MR. FISH:

18   Q.   Do you recognize the -- what's depicted in this photograph?

19   A.   Yes, sir, that's a sign.  The stop is a little bit further

02:04    20   to the east by an area that we call lone pine.  It's an old

21   abandoned house with a red wall.

22   Q.   And is this a fair and accurate representation of this

23   stretch of road?

24   A.   Yes, sir, it is.

02:04    25        MR. FISH:  I'd ask to admit Defense G.

1         MR. OLAH:  No objection.

2         THE COURT:  Admitted.

3      (Defense Exhibit G admitted.)

4   BY MR. FISH:

02:04   5   Q.  You also testified that there are horse ranches in the

6   area?

7   A.  There are horse ranches in the area, but I didn't say

8   that -- I didn't testify that there were horse ranches, just

9   ranches in general.

02:04   10  Q.  Ranches in general, and there are also horse ranches?

11  A.  There's one to the west of where the trail exits onto State

12  Route 94 by about maybe a quarter to a half mile.  And then

13  there's other folks that raise horses on the north side of

14  State Route 94.

02:05   15  Q.  And as a border patrol agent or as a supervisory border

16  patrol agent, are you familiar with the location of border

17  checkpoints in that area?

18  A.  Yes, sir.

19  Q.  There's one to the west of the Tecate Port of Entry on the

02:05   20  94, correct?

21  A.  Yes, sir, it is in Dulzura, California.

22  Q.  But there is not one to the east, correct?

23  A.  Not to the east of State Route 94, no, sir.

24         MR. FISH:  Thank you.  No further questions.

02:05   25         THE COURT:  Any redirect?

1    MR. OLAH:  Briefly, Your Honor.

2                   REDIRECT EXAMINATION

3  BY MR. OLAH:

4  Q.   Agent Muñoz, is Spanish your primary language?

02:05    5  A.   Of when I was -- yes, I spoke Spanish the better part of

6  five years until I started speaking English.

7  Q.   And that was the language spoken at your home growing up?

8  A.   Yes, sir.

9  Q.   Do you consider yourself conversational in Spanish?

02:06   10  A.   Yes, sir, I do.

11  Q.   Did it appear when you asked these three individuals,

12  including the defendant, the questions that you did in the

13  field that they -- let me rephrase it.  When you asked

14  defendant these questions, did it appear he understood what you

02:06   15  were asking?

16                   MR. FISH:  Objection.  Leading.

17                   THE COURT:  Overruled.

18                   THE WITNESS:  Yes, sir.

19  BY MR. OLAH:

02:06   20  Q.   And did he provide a response that you understood?

21  A.   Yes, sir.

22  Q.   And was that response responsive to the question you asked?

23  A.   Yes, sir.

24  Q.   When you exited your vehicle and reported to the intrusion

02:06   25  device, were these individuals waving you down, yelling at you,

1    trying to get your attention in any way?

2             MR. FISH:  Objection.  Beyond the scope.

3             THE COURT:  It is beyond the scope.

4             MR. OLAH:  Your Honor, I would ask -- I would argue

02:06   5    that the government has to prove that he entered with the

6    intent to remain free from official restraint, that he was

7    coming here --

8             THE COURT:  That's not the objection.  The objection

9    is that you could have asked this during direct.  You didn't.

02:06  10            MR. OLAH:  Oh.

11            THE COURT:  And so -- and this was not a subject of

12   cross-examination, so the objection is that this is new direct,

13   not redirect.

14            MR. OLAH:  And not irrelevant as I understood the

02:07  15   question.  I apologize.

16   BY MR. OLAH:

17   Q.   These three individuals were laying down as you encountered

18   them?

19            MR. FISH:  Objection.  That's also beyond the scope.

02:07  20            THE WITNESS:  Yes, sir.

21            THE COURT:  No, that was actually -- it simply

22   is -- it was stated during direct, and I'm doing it as

23   rehabilitation.

24            THE WITNESS:  Yes, sir.

25

```
 1   BY MR. OLAH:
 2   Q.   Go ahead.
 3   A.   Yes, sir, they were laying down in the brush.
 4   Q.   On their stomachs or backs?
 5   A.   Stomachs, from what I recall.
 6            MR. OLAH:  No further questions, Your Honor.
 7            THE COURT:  Mr. Fish?
 8            MR. FISH:  No recross, Your Honor, but I would renew
 9   my motion under United States versus Zemian (phonetic) to
10   suppress the field statements on hearsay interpretation
11   grounds, and I can name the factors to the Court in that case
12   listed.  One of them is sufficient capacity -- or I guess we
13   can let the witness stand down before I do this.
14            THE COURT:  You can step down, Agent Muñoz, unless you
15   like the view.
16            THE WITNESS:  Thank you, Your Honor.
17            THE COURT:  It's a good view.
18            MR. FISH:  Two of the enumerated factors are whether
19   the interpreter has any motive to mislead.  In this case, it's
20   the arresting agents, who I think by necessity has motive to
21   shade things in the direction of justifying the arrest and the
22   interpreter's qualifications.
23       As Agent Muñoz testified, he has no certification, no
24   training, no -- he would certainly not be permitted to be,
25   like, a court interpreter, for example, providing
```

1    Mr. Nunez-Soberanis' responses in live testimony, so I think

2    it's appropriate not to provide interpretation from those

3    responses that are out of court.

4         THE COURT:  I'll continue to overrule the objection.

02:08  5    The questions asked were not complex or legal in nature.  These

6    were conversational questions, and Agent Muñoz has demonstrated

7    the ability to engage in this level of communication without

8    issue.

9         So another witness?

02:09  10        MR. OLAH:  Yes, Your Honor, one more.  The

11   United States calls border patrol Agent Steven Cabrera.

12                          STEVEN CABRERA,

13                    GOVERNMENT'S WITNESS, SWORN

14        THE CLERK:  Would you state and spell your full name

02:09  15   for the record.

16        THE WITNESS:  Steven Cabrera, C-A-B-R-E-R-A.

17        THE COURT:  You can sit.

18                        DIRECT EXAMINATION

19   BY MR. OLAH:

02:09  20   Q.  Good afternoon, Agent Cabrera.

21   A.  Good afternoon.

22   Q.  Where do you work?

23   A.  United States Border Patrol.

24   Q.  What's your title?

02:10  25   A.  Border patrol agent, U.S. Border Patrol agent.

35

1    Q.   And how long have you been a border patrol agent?

2    A.   Ten years.  A little bit over ten years.

3    Q.   What's your current area of responsibility?

4    A.   I work at the El Cajon border patrol station.

02:10    5    Q.   How long have you been there?

6    A.   Three and a half years.

7    Q.   What's your current assignment?

8    A.   Border patrol line agent.

9    Q.   Agent Cabrera, if you could pull the microphone a little

02:10   10    bit closer to you.  Thank you.

11         Does that include interviewing subjects in the field?

12    A.   It does in another position.

13    Q.   And what is that position?

14    A.   That was an ASID agent.  You do interviews.

02:11   15    Q.   Were you assigned to ASID on October 16th, 2018?

16    A.   Yes, I was.

17    Q.   What do your responsibilities on the ASID assignment

18    entail?

19    A.   That would be debriefing aliens that would be coming into

02:11   20    our custody, and we would do sworn statements if it was going

21    to be a criminal case.

22    Q.   Would you also do Mirandized interviews?

23    A.   That's correct, yes.

24    Q.   How long were you on this ASID assignment?

02:11   25    A.   Over two years.

1   Q.   And October 16th, was that towards the end of those two

2   years?

3   A.   No, it was probably in the middle.

4   Q.   Smack dab in the middle?

02:11   5   A.   Yes.

6   Q.   Okay.  Were you working on October 16, 2018?

7   A.   Yes.

8   Q.   Did you interview an individual by the name of José Luis

9   Nunez-Soberanis that day?

02:12   10   A.   I did.

11   Q.   Do you see that individual in the courtroom here today?

12   A.   I do.

13   Q.   Can you please identify him by an article of clothing?

14   A.   The gentleman with the white shirt and blue stripes.

02:12   15   Q.   And I'll ask, is he wearing a jacket or no jacket?

16   A.   No jacket.

17        MR. OLAH:   Let the record reflect that the witness has

18   identified the defendant in this case, Mr. Nunez-Soberanis.

19        THE COURT:   It will so reflect.

02:12   20   BY MR. OLAH:

21   Q.   Was that interview in an interview room, a holding cell, a

22   jail cell, outside?

23   A.   It's an interview room.

24   Q.   Can you describe that room for us?

02:12   25   A.   15 by 15, maybe 10 by 10.  I'm not sure.  It has a desk, it

1    has a bench for the aliens, a desk for us, with computer

2    monitors and cameras.

3    Q.   Video cameras?

4    A.   Video cameras and audio.

02:12    5    Q.   Was Mr. Nunez handcuffed during that interview?

6    A.   No, he was not.

7    Q.   Was he in leg restraints?

8    A.   No, he was not.

9    Q.   Was he in any restraints of any kind?

02:13    10    A.   None at all.

11    Q.   Was he in a jumpsuit?

12    A.   No.

13    Q.   What kind of clothes was he wearing?

14    A.   I don't remember, but street clothes.  I don't know exactly

02:13    15    what kind of clothes it was.

16    Q.   What were you wearing?

17    A.   Probably a black polo like this and blue jeans.

18    Q.   Did you have any weapons visible to Mr. Nunez on your

19    person?

02:13    20    A.   No.

21    Q.   Did you have any weapons on your person at all?

22    A.   None.

23    Q.   Did you speak to him in the same tone that you're

24    testifying today?

02:13    25    A.   Yes.

1  Q.  Did you video-record your interview of Mr. Nunez?

2  A.  Yes, we did.

3  Q.  How long approximately was that interview from start to

4  finish?

02:13  5  A.  A little over 15 minutes.

6  Q.  Did you start that interview in English?

7  A.  Yes.

8  Q.  Did you end up speaking Spanish at some point?

9  A.  Yeah, within a minute or so we switched to Spanish.

02:13  10  Q.  Why?

11  A.  He didn't understand what I was saying.

12  Q.  Okay.  Are you a native Spanish-speaker?

13  A.  Yes, I am.

14  Q.  Have you previously been responsible for teaching Spanish

02:14  15  to other people?

16  A.  I have.

17  Q.  Did you previously have a translation business?

18  A.  I did.

19  Q.  Did you provide your Miranda warnings -- back up.  Did you

02:14  20  provide Mr. Nunez Miranda warnings?

21  A.  Yes, I did.

22  Q.  In what language?

23  A.  Spanish.

24  Q.  Did he state that he understood the rights that you had

02:14  25  advised him of?

1    A.   Yes.

2    Q.   And taking it a step back, did you advise him of the right

3    to remain silent?

4    A.   I did.

02:14  5    Q.   Did you advise him that anything he said could be used

6    against him in a court of law?

7    A.   Yes.

8    Q.   Did you advise him that he has the right to speak to a

9    lawyer before answering your questions?

02:14 10    A.   Yes.

11    Q.   Did you explain that if you cannot afford a lawyer, one

12    would be appointed for him?

13    A.   Yes, I did.

14    Q.   And did you explain that if he chose to answer your

02:14 15    questions without an attorney present, he had the right to

16    terminate the interview at any time?

17    A.   Yes.

18    Q.   And after being apprised of those rights, did he state that

19    he understood them?

02:15 20    A.   Yes, he did.

21    Q.   Did he state that he was willing to talk to you?

22    A.   Yes.

23    Q.   Without an attorney present?

24    A.   Correct, yes.

02:15 25    Q.   Did he sign or initial a written Miranda form in the

1    Spanish language?

2    A.   Yes, he did.

3    Q.   During the substance of that interview, did you ask if he

4    had any documents allowing him to enter or remain in the

02:15    5    United States?

6    A.   Yes, I did.

7    Q.   What was his response?

8    A.   He said no.

9    Q.   Did he provide any such documents to you?

02:15    10    A.   No, he did not.

11    Q.   Did you ask what time he had entered the United States that

12    day?

13    A.   Yes, I did.

14    Q.   What was his response?

02:15    15    A.   Approximately 3:00, 3:30.

16    Q.   Did you ask how he had entered the United States that day?

17    A.   Yes.

18    Q.   What was his response?

19    A.   He said, "I went around the fence."

02:15    20    Q.   Did he mention the desert?

21    A.   The ranch or the desert or some large area that was

22    abandoned there.

23    Q.   Okay.  Did you ask if he knew he was breaking the law by

24    entering that way?

02:16    25    A.   Yes.

1    Q.   What was his response?

2    A.   That he did know.

3    Q.   That he did know he was breaking the law?

4    A.   He did know he was breaking the law.

02:16   5    Q.   Did you ask if he was inspected by an immigration officer

6    that day?

7    A.   Yes.

8    Q.   What was his response that day?

9    A.   He said no.

02:16   10   Q.   Did you ask what his purpose in entering the United States

11   was?

12   A.   Yes.

13   Q.   What was his answer?

14   A.   To come to work in the United States.

02:16   15   Q.   Did he indicate a specific city as his destination?

16   A.   San Diego.

17   Q.   Did he mention any family in San Diego?

18   A.   Two brothers, I believe.

19   Q.   Did you ask if he had used a coyote?

02:16   20   A.   Yes, I did.

21   Q.   What does "coyote" mean in this context?

22   A.   A smuggler, human trafficker.

23   Q.   Did he seem to understand that question when you asked it?

24   A.   Yes.

02:16   25           MR. STITT:   Objection.   Calls for speculation, lack of

1    personal knowledge.

2              THE COURT:  Overruled.

3    BY MR. OLAH:

4    Q.   Can you restate your answer, please?

02:17   5    A.   He was -- a "coyote," meaning a human smuggler, someone

6    who's transporting a body illegally.

7    Q.   What was his response to your question of whether he had

8    used a smuggler or a coyote?

9    A.   He said he did.

02:17  10    Q.   Did you ask how much he was being charged?

11    A.   Yes.

12    Q.   What was his response?

13    A.   $8,000.

14              MR. OLAH:  No further questions at this time,

02:17  15    Your Honor.

16              THE COURT:  All right.  Mr. Stitt, Mr. Fish?

17              MR. STITT:  Can I just have a very brief moment?

18              THE COURT:  Sure.

19              MR. STITT:  Your Honor, we have no questions.

02:17  20              THE COURT:  You are free to leave, Agent Cabrera.

21    Thank you.

22              THE COURT:  Does the government have another witness?

23              MR. OLAH:  No, Your Honor.  The United States rests.

24              THE COURT:  The defense?

02:18  25              MR. FISH:  We rest and move for a verdict of acquittal

1   and for suppression of the statement.  Mr. Stitt will argue the

2   suppression.

3           THE COURT:  All right.  Be my guest.

4           MR. STITT:  Your Honor, the Court, I think, properly

02:18   5   highlighted the San Juan Cruz issue before the trial.  The

6   government proffered that the immigration statement was taken

7   after the Miranda advisal, but they did not elicit that sworn

8   testimony from the agent.  The government bears the burden to

9   show compliance with Miranda and San Juan Cruz.

02:18   10      I have another unpublished case from this year -- it's in

11   January -- Ramirez-Carillo.  That simply just again applies

12   San Juan Cruz in the context of the government must -- the

13   government bears the burden of showing compliance with these.

14      I think that here the proffer from the United States

02:19   15   Attorney was clear, but the evidence is not.  The government

16   bears the burden of pointing this out, establishing compliance

17   with Miranda before admission, and they haven't.

18      So we would move for suppression of, really, the entirety

19   of Agent Cabrera's testimony, which was all the post-arrest or

02:19   20   post-Miranda statement.

21           THE COURT:  Mr. Olah.

22           MR. OLAH:  Yes, Your Honor.  There is also no evidence

23   of an admin interview or a sworn statement.  The only evidence

24   that was produced was that he advised him of his Miranda

02:19   25   rights, the circumstances --

02:20

1          THE COURT:  No, we have Exhibit B to the interview or

2     to the defense motion, which was obtained from the government

3     in discovery that reflected on the same date that the same

4     agent conducted an administrative interview of the defendant

5     without Miranda.  And the question I asked was whether that

6     interview occurred before or after the Mirandized statement.

7     You said that it would be after, and that testimony would be

8     elicited.

9          Right now all I have is an administrative interview which

02:20  10     was not properly Mirandized and a Miranda interview which was,

11     and the question of which occurred when remains a bit obtuse.

12          MR. OLAH:  I don't know what evidence we have

13     indicating that the admin interview preceded the Miranda.

14          THE COURT:  We have evidence in no direction; however,

02:20  15     I believe that Mr. Stitt and Mr. Fish are correct that the

16     government has to show compliance with Miranda.  If it was

17     before the Mirandized statement, a statement obtained in

18     violation of Miranda, the government has the obligation under

19     San Juan Cruz to have cleaned that up when it took the

02:21  20     Mirandized statement.

21          The issue remains at the moment as to whether there's any

22     evidence that this administrative proceeding occurred after the

23     Mirandized statement, in which case the Mirandized statement is

24     not tainted at all.

02:21  25          MR. OLAH:  Can I confer with counsel for a moment,

1    Your Honor?

2         THE COURT:  Of course.

3         MR. OLAH:  Your Honor, I don't think there was

4    submitted in connection with the motion a declaration or any

02:22  5    sort of assertion backed by evidence that the admin interview

6    or the sworn statement that was prepared preceded --

7         THE COURT:  Exactly right.  What the motion was was to

8    say that if the administrative interview occurred first, then

9    the Mirandized statements, which would have occurred later,

02:23  10   should be suppressed.

11       The defense conceded basically that if the Mirandized

12   interview occurred first, then the fact that there was an

13   expedited removal interview after is irrelevant.

14       So the only thing the government had to show was the timing

02:23  15   of the interviews.  If the Miranda interview occurred first, no

16   problem.  If the administrative interview occurred immediately

17   prior to the Mirandized statement, a San Juan Cruz problem.  Do

18   you understand?

19       MR. OLAH:  I do.

02:23  20   I guess I'd make it a more fundamental problem.  There's no

21   testimony that there was a separate interview.  We're talking

22   about the timing of interviews, one of which is complete

23   hypothetical and didn't --

24       THE COURT:  Well, again, I disagree with you there

02:23  25   because these were clearly documents obtained from the

1    government in discovery.  It's the agent's report.  You can't

2    walk away from that.  You can't disavow a report of this agent

3    that you provided in discovery, which was Exhibit B to the

4    defense motion, much as the transcript of that interview was

02:24   5    obtained in discovery from the government and is Exhibit C to

6    the defense motion.  I don't see that you can disavow the

7    validity or authenticity of those documents.

8        The recorded interview, Exhibit C, has a time-stamped or it

9    says when it started.  Exhibit B, the administrative or

02:24   10   expedited removal document, shows the same date, same agent,

11   but no time.  So it begs the question as to the chicken or the

12   egg, and it makes a difference here.

13           MR. OLAH:  So to the extent we're doing a hybrid trial

14   and evidentiary hearing, I would request to recall the witness

02:24   15   to testify to that limited scope of the evidentiary hearing

16   component.  I don't think the Exhibit B is admitted into

17   evidence.

18           THE COURT:  It is not.

19           MR. OLAH:  So I mean --

02:25   20           THE COURT:  Neither is C, for that matter.

21           MR. OLAH:  So we're making a ruling about -- on

22   nothing, right?  All we have -- the only testimony that's been

23   presented today is the witness saying the conditions under

24   which he took a Mirandized interview, that he properly -- I

02:25   25   mean, that's a legal conclusion, that he informed the defendant

1    of his Miranda rights, and that individual waived those Miranda

2    rights in a written waiver.

3        To the extent that we are now drawing in procedurally from

4    past filings, I would request the right to call the witness as

02:25    5    to that limited scope.

6            THE COURT:  No, and the reason for that is

7    before -- minutes before the trial started, I told you exactly

8    what the problem was, and you explained to me exactly how you

9    would solve it, and you didn't.  I can't give you that second

02:25   10    bite.

11            MR. OLAH:  Okay.

12            MR. FISH:  So I don't know if it's necessary

13    procedurally to move for acquittal or to --

14            THE COURT:  No, I mean, your motion is outstanding.

02:26   15    What I intend to do is allow the parties to close, and I

16    would -- I am going to hold off my ruling on suppression until

17    I hear what the closing arguments are, and then I will decide

18    whether I will suppress the Mirandized statements or not and

19    whether it makes a difference.

02:26   20            MR. STITT:  May I just very briefly be heard on the

21    suppression, very briefly?

22            THE COURT:  I don't know what there is to add,

23    Mr. Stitt.

24            MR. STITT:  Well, I think that the quote from San Juan

02:26   25    Cruz that I think is relevant for the Court's consideration of

1   the motion given the Court's, I think, properly framed the

2   issue that the government has failed to present, and it's that

3   when a warning not consistent with Miranda is given prior to,

4   after --

02:26   5          THE INTERPRETER:  Can you slow down?

6          MR. STITT:  -- prior to, after, or simultaneously with

7   the Miranda warning, the risk of confusion is substantial, such

8   that the onus is on the government to clarify to the arrested

9   party the nature of his or her rights under the Fifth

02:27   10   Amendment.  And we would rest on that.

11          MR. FISH:  So my question is, who goes first?

12          THE COURT:  The government remains to have the burden,

13   it always does, so --

14          MR. FISH:  Good.

02:27   15          THE COURT:  -- Mr. Olah, you may close, and I would

16   suggest to the extent you can argue the case in the alternative

17   with the Mirandized statements in and out --

18          MR. OLAH:  That's what I intend to do, to briefly

19   address --

02:27   20          THE COURT:  Slow down a bit.

21          MR. OLAH:  -- to address the point that Mr. Stitt just

22   made, I understand San Juan, I understand the Court's position,

23   but we're talking about an admin interview that did not occur.

24   There's no taint.  The only evidence presented today is a

02:28   25   ten-year border patrol agent who has experience giving Miranda

1    warnings and taking Mirandized interviews testifying under

2    these circumstances that he's spelled out, "I advised this

3    individual of his rights, he waived them, he signed the written

4    waiver, and he answered my questions."  San Juan's not relevant

02:28   5    because we don't have an admin interview, and the only evidence

6    before Your Honor is something submitted with a pretrial motion

7    to suppress.  I understand Your Honor's position.

8              THE COURT:  Again, it is disingenuous to disavow a

9    document provided by the government in discovery authored by

02:28   10   its own agent.  I don't understand.  You're suggesting no admin

11   interview occurred, yet we have an exhibit provided by the

12   government in discovery that appears to be an interview of the

13   defendant.

14             MR. OLAH:  And I'll own up to the error in not

02:28   15   following through on my promise of eliciting testimony from the

16   agent to the effect that he used the answers provided in the

17   Mirandized interview for purposes of preparing that form.

18   That's the sword I've laid down, and I'm falling on it, and I'm

19   not concerned because we still have one witness who established

02:29   20   all four elements of this crime.

21       So first, as to alienage, the single best source for the

22   defendant's alienage is the defendant, and he told Agent Muñoz

23   in his native Spanish language to a native Spanish-speaker, "I

24   am a citizen of Mexico."  He also told Agent Muñoz, "I don't

02:29   25   have documents."  And Agent Muñoz further testified he didn't

1   produce any documents.

2       The government cannot, of course, rest on field statements

3   alone for proving alienage.  The government hasn't done that

4   here.  Other factors the Court can look at per the case law,

02:29   5   the United States has to supplement these defendant's

6   admissions with some evidence.  And that evidence is to be,

7   quote, taken as a whole under Ninth Circuit case law.

8       Looking at the other factors, we've got the single "I'm a

9   citizen of Mexico, and I do not have documents."  "I don't have

02:30   10  documents" actually corroborates alienage.  There are actually

11  two different statements.  One supports the other.  That's not

12  the only fact corroborating.

13      We also have the location of corroboration.  We're a mile

14  north -- activation of the seismic intrusion device is a mile

02:30   15  north of the United States International Boundary.  These

16  individuals, including the defendant, were found further north

17  of that, meaning they activated -- circumstantial evidence, the

18  inference would be they activated this device and continued

19  their trek north down what Agent Muñoz testified was a known

02:30   20  smuggling route.  That sensor is there for a reason.  He's had

21  prior apprehensions there.

22      Another fact corroborating this individual's admissions of

23  alienage, he's hiding under a brush.  He's on his stomach

24  hiding with two other individuals.  I'll leave it at that.

02:31   25      So to the extent we have very, very good evidence of this

1    individual's alienage, his statements to Agent Muñoz, those are

2    corroborated by several facts surrounding his outreach.

3        As to the second element, the intent to enter at a time or

4    place other than as designated by immigration officers, the

02:31   5    case law, including the most recent Ninth Circuit case, makes

6    clear that just means anywhere other than a port of entry.

7        Agent Muñoz testified that the defense closest to this

8    apprehension site is not a port of entry, it's not an area

9    designated by immigration offices for entry rather.  The

02:31   10   nearest port of entry is Tecate, and that is eight miles away.

11       As to the intent to enter free from official restraint, you

12   can again look at the circumstances of the apprehension, a mile

13   north laying under shrubs.  Your Honor saw three exhibits

14   depicting the location, including the third being Agent Muñoz

02:32   15   hiding under the very shrubs that these individuals were.

16       The fourth element the United States has to prove is a

17   substantial step.  Again, a mile north attempting to hide.

18   He's so close to State Highway 94, he's traveling and

19   activating a sensor on a known smuggling route.  I believe

02:32   20   there are several substantial steps corroborating to enter and

21   remain in the United States, and I'll submit on that,

22   Your Honor.

23       THE COURT:  All right.  Thank you.

24   Mr. Fish.

02:32   25       MR. FISH:  Thank you, Your Honor.

1    So at the outset, I would request -- I do think the

2    evidence is such that Your Honor could decide for acquittal

3    today, but I would also request the ability to brief the corpus

4    delicti issue or I also have a pocket briefing available here

02:33    5    that I can provide the Court that provides the relevant cases.

6    I'll go through the analysis orally first.

7    As the government pointed out, it does have the burden

8    of -- it does need to corroborate an admission with additional

9    evidence.  There have been three acquittals in this district

02:33    10   very recently on this exact issue, and all three of them had

11   basically the same factual scenario.  Your Honor's done the

12   suppression issue.  I know I don't need to go into that.  The

13   facts in this case came out better for the defense because

14   there's only one statement, the field statement, which

02:33    15   apparently is, "Just Mexico."

16   So I can provide the case citations for those.  So

17   Judge Major entered a judgment of acquittal in United States

18   versus Musadio Montanez Acuna (phonetic).  In that case there

19   were field statements, and the only corroborating evidence was

02:34    20   that the defendant was found hiding in the brush, and the agent

21   had to ask him to stand up, virtually the same as the evidence

22   that the government just argued in closing in this case.

23   Judge Curiel entered a judgment of acquittal just last week

24   in United States versus Raul Gonzalez-Armenta.  That case

02:34    25   involved multiple admissions of alienage, both a field and, I

1    believe, a post-Miranda statement and mode of entry, but the

2    Court found that these admissions were insufficient to carry

3    the government's burden under the Corpus Delicti Doctrine.

4        Furthermore, Judge Hayes in United States versus

5    Mazariegos-Ramirez in March of this year reached the same

6    ruling and with virtually the same set of facts, that someone

7    simply saying they are from Mexico with the only other

8    corroborating evidence being their location is not sufficient.

9        What the government didn't bring in and could have brought

10   was any evidence from an A File, any evidence to prior

11   deportations, any evidence of, you know, even applications for

12   admission or anything of that sort.  They brought no

13   documentary evidence whatsoever.

14       They have simply -- as far as I can tell, the only evidence

15   that they're relying on to show that Mr. Nunez-Soberanis is an

16   alien is him stating the word "Mexico" to the agent in the

17   field.

18       Obviously, you can be both a citizen of Mexico and a

19   citizen of the United States, and him saying that he did not

20   have any documents, he didn't have any documents on him, it

21   wasn't clarified what exactly that meant.  Maybe he was asking

22   if you have documents right there.  Who's to say?  So it's not

23   even totally clear that the field statements establish

24   alienage, and beyond that, as the arresting agent testified, he

25   was speaking to three people at once.  The entire encounter

02:36 1    lasted about two minutes, and it's not, I don't think, from the
      2    agent's own testimony -- it's not clear that he got into the
      3    details of, you know, speaking to each particular person and
      4    drawing out alienage other than just that simple call and
02:36 5    response, and it's also not even clear that he could have been
      6    speaking to all three people at once, which is -- I asked him
      7    if he spoke to them as a group, and he said yes.  He could have
      8    heard two of them say "Mexico" and the other one didn't say
      9    anything.

02:36 10        This is certainly not enough to prove in a court of law
      11   beyond a reasonable doubt that somebody is an alien.

      12        Furthermore, as Agent Muñoz testified, this is an area with
      13   homes.  This is an area with a horse ranch.  This is an area
      14   with a school bus stop.  This is a populated area, and so this
02:36 15   case is even better for the defense than some of the other
      16   cases that have resulted in acquittals because it's not as
      17   though he was found in the hills, in the middle of nowhere.  He
      18   was found near homes.  He could have been, you know,
      19   notwithstanding -- he could have been in those homes.  He could
02:36 20   have been at the horse ranch.  He could have been waiting for
      21   the school bus.  There's simply not enough here to convict him
      22   given the Corpus Delicti Rule.

      23        Sorry, one moment.

      24        I believe -- and I also want to -- as I'm sure the Court
02:37 25   knows, closing is not argument, and I do want to -- any

1   assertions that the prosecutor makes about this suppression

2   issue, they're factual, there has to be evidence and not

3   argument.

4       I believe that's all unless the Court has any questions.

02:37   5           THE COURT:  No questions.

6           MR. FISH:  Okay.

7           THE COURT:  Rebuttal?

8           MR. OLAH:  Briefly, Your Honor.

9       We just heard some cases in which other judges in this

02:38   10  district have applied the standard, but defense counsel

11  neglected to mention the standard.  Again, that standard under

12  the Ninth Circuit case law is some evidence.  We've presented

13  that.  That's some evidence taken as a whole.  I won't recount

14  what I just went through, but I will note that there's Ninth

02:38   15  Circuit case law that I'd briefly like to highlight that found

16  the limited facts that Agent Muñoz did testify to to be

17  relevant to the issue of whether there was sufficient

18  corroboration of alienage.

19      The first would be United States versus Garcia-Villegas,

02:38   20  the second one being -- V-I-L-L-E-G-A-S, 575 F.3d 949, a Ninth

21  Circuit opinion from 2009.  Amongst the other factors the Court

22  found he sufficiently corroborated the issue was, quote, hiding

23  in a bush on the American side.  If hiding under some shrubs

24  here in the United States a mile north, that fact I think does

02:39   25  corroborate the admission.

1       It's not the only fact and not the only Ninth Circuit case
2    I'm relying on.  I'd also cite for Your Honor United States
3    versus Nunez-Beltran, 434 F appendix 640, Ninth Circuit, 2011,
4    unpublished case.  In that case the Ninth Circuit found, quote,
5    the defendant's, Nunez-Beltran's, attempts to cross the border
6    without documentation and without inspection, end quote,
7    corroborated the alienage admission.  That's the standard.

8       Looking at the evidence as a whole, the United States, even
9    with just focusing on Agent Muñoz's testimony, has produced
10   evidence sufficient to corroborate the alienage admission, and
11   that was made in the field, and I'll rest on that, Your Honor.

12          THE COURT:  So first, I am going to suppress the
13   Miranda statements.  I don't think that the government
14   sustained its burden to show a sufficient break or saving of
15   the Miranda statements depending upon when it was that the
16   administrative expedited removal document was created.

17       I understand the government's argument that there is no
18   evidence as to what -- to when that removal occurred, but there
19   is.

20       In the government's discovery, it occurred the same day.
21   And without a showing that it occurred after the Mirandized
22   statement, I feel compelled -- there is some -- I will say for
23   purposes of whatever comes next, there is some evidence in
24   Exhibit B itself that I mentioned, which the very last entry
25   was, "Were you advised of your consulate rights?"  And the

1    answer was, "Yes."

2         We also don't know exactly when that occurred, but there

3    was early in the Miranda, the pre-Miranda, a question as to

4    whether there was an advisal of the consulate rights.

02:41   5         So there is some evidence that the expedited removal

6    document was completed after the interview, but the government

7    could have saved itself a lot of trouble with a single

8    question, and it didn't, and I can't fix it for them, and I'm

9    not going to.

02:41   10        That leaves me with the question as to whether the evidence

11   remains sufficient at this point to find Mr. Nunez-Soberanis

12   guilty of the charged offense.

13        The question there, as has been argued by the parties using

14   case law with which I am familiar, the question of what we call

02:41   15   corpus delicti.  Is there enough corroboration of the

16   defendant's statement that he was from Mexico and without

17   documentation, one; and whether that is sufficient under these

18   circumstances to find that he committed the charged offense.

19        I find the defendant guilty of the charged offense.  And I

02:42   20   do this for the following reasons:  The evidence of his

21   attempted illegal entry are that this trail from the border up

22   to Route 94 is in a remote area.  While there are some houses

23   and there are some ranches in the vicinity, they do

24   not -- there's no evidence that these homes and ranches use

02:42   25   this trail for any purpose.  They don't lead based upon the

1    evidence to any of those homes or ranches.

2         There was an intrusion device that was triggered north of

3    the border, roughly a mile, and that the tracks that

4    Agent Muñoz followed were heading north suggesting, of course,

02:43    5    that the defendant's -- the defendant, I should say, triggered

6    the device and continued north until found hiding in brush next

7    to Route 94.  I find that evidence barely sufficient for the

8    intended purpose.

9              MR. FISH:  So --

02:43    10              THE COURT:  I don't know that this is argument,

11    Mr. Fish.

12              MR. FISH:  Okay.

13              THE COURT:  I may be wrong, and some other judge will

14    decide that some day if that's where it goes.

02:43    15              MR. FISH:  Can I clarify one of the Court's rulings?

16              THE COURT:  Sure, if you want.

17              MR. FISH:  When I objected to the information about

18    the device being triggered, you said it was not offered for the

19    truth, it was offered --

02:43    20              THE COURT:  No, you objected to his -- whether he can

21    tell you how they work.

22              MR. FISH:  No, I also objected on hearsay grounds to

23    the fact that it was triggered, and you said it's not offered

24    for the truth.

02:44    25              THE COURT:  Not exactly.  The record will reflect what

1    I did.  My point was that he was not testifying about the

2    science of the device, and the triggering of the device can't

3    be hearsay because it's not a statement by anybody.  So I don't

4    really know the point.

02:44   5        That said, the evidence is what it is.  And whether it's

6    sufficient or not, I find that it is sufficient beyond a

7    reasonable doubt.  Recognizing that it could have been a lot

8    better for the government, as I say, it's not my job to do the

9    government's work for them.  I'm not.  But here we have the

02:44   10   facts as were testified to by Agent Muñoz.  That is sufficient

11   to find that on or about the date in question, the defendant

12   committed the charged offense.

13        MR. OLAH:  Just one request for the record.  That

14   conclusion is excluding everything that Agent Cabrera testified

02:44   15   to and looking at Agent Muñoz?

16        THE COURT:  Yes, Agent Cabrera's testimony is

17   excluded.

18        So I intend to sentence the defendant to time served.  If

19   you want to put that off, we can put it off, but it's going to

02:45   20   be time served regardless.

21        MR. FISH:  Yes, Your Honor, we would request to put

22   that off.

23        MR. OLAH:  The government is going to request time

24   served.  He's been in this country without status since

02:45   25   October 16th.  We're coming up on a year.

```
 1          THE COURT:  If it makes a difference to you, Mr. Fish,
 2    I am going to remand the defendant into border patrol custody
 3    regardless of whether we sentence him today, so --
 4          MR. FISH:  How --
 5          THE COURT:  -- I'll remand him to my custody, if you
 6    like, and then when we do the sentencing, he'll end up going to
 7    border patrol anyway, so all you're gaining is time for the
 8    defendant.  I am not going to release him pending sentencing.
 9          MR. FISH:  I see.  So I'd at least argue for that
10    request being on bond re sentencing.
11          THE COURT:  You can -- recognizing that the burden is
12    on you to show by clear and convincing evidence that he should
13    be released.
14          MR. FISH:  Right.  So Mr. Nunez-Soberanis has been out
15    of custody, I guess, for almost a year now.  He has made every
16    single court appearance.  He calls me, you know, several hours
17    before every court appearance and several times a week.  He is,
18    I would say, of every client I've dealt with, probably the most
19    committed to coming to court and making all his appearances.
20       He also has an approved I-130 petition and has for a number
21    of years, and he's now working with an immigration lawyer to
22    try to obtain a visa.  Once he obtains a visa, he'll be able to
23    become a Legal Permanent Resident, and I think that provides
24    another incentive for him not to flee.
25       He has -- you know, if he's successful in this immigration
```

1    process, he has a great deal to gain that could be lost if he

2    absconds for some reason, so I think there's virtually no

3    flight risk, especially considering his excellent track record

4    of coming to court and the fact that he's, you know --

02:46    5         THE COURT:  And putting this matter off for a week,

6    what does that do for you?  Because that's all I would do if I

7    was going to go that route.

8         MR. FISH:  Just a week?  It would provide him with

9    another week to stay here with his brother.

02:47   10         THE COURT:  So your option is I remand him pending

11   sentencing or we go forward with the time-served sentence now.

12         MR. FISH:  If those are the two options, I'll ask to

13   go forward.

14         THE COURT:  The government?  Time served?

02:47   15         MR. OLAH:  Submitted.

16         THE COURT:  Time served?

17         MR. FISH:  Yes.

18         THE COURT:  All right.  Mr. Soberanis Nunez-Soberanis,

19   I will sentence you to time served.  I'll find that you do not

02:47   20   have the ability to pay a fine.  They'll be no fine.

21      Will the government move to remit the special assessment?

22         MR. OLAH:  So moved, Your Honor.

23         THE COURT:  You do have the right to appeal the

24   Court's judgment by filing a Notice of Appeal within 14 days.

02:47   25   I wish you the best of luck, and I will allow border patrol to

1   take you into custody.

2        Thank you, gentlemen.

3            THE CLERK:  That concludes all matters.  We are off

4   the record.

5                            ---000---

6

7                      C-E-R-T-I-F-I-C-A-T-I-O-N

8

9        I certify that the foregoing is a correct transcript from

10  the record of proceedings in the above-entitled matter.

11

12       Dated November 16, 2019, at San Diego, California.

13

14
                            /s/ Dana Peabody_____
15                          Dana Peabody,
                            Registered Diplomate Reporter
16                          Certified Realtime Reporter

17

18

19

20

21

22

23

24

25